**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**LARRY MATTHEW PUCKETT**                                                   **PETITIONER**

**VS.**                                                   **CIVIL ACTION NO.: 2:04CV302HSO**

**CHRISTOPHER B. EPPS, Commissioner,**
**Mississippi Department of Corrections and**
**LAWRENCE KELLY, Superintendent,**
**Mississippi State Penitentiary**                                                   **RESPONDENTS**

## MEMORANDUM OPINION AND ORDER

## I. PROCEDURAL HISTORY

Larry Matthew Puckett was convicted of the capital murder, while in the commission of sexual battery, of Rhonda Hatten Griffis. Puckett was sentenced to death by the Circuit Court of Forrest County on August 5, 1996. On direct appeal the Mississippi Supreme Court remanded the case to Forrest County for a hearing on whether the jury selection process had unconstitutionally discriminated against black jurors, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). *Puckett v. State*, 737 So. 2d 322 (Miss. 1999). The court denied relief on every other issue. The Circuit Court held a hearing on that issue and denied relief, after which the case returned to the Mississippi Supreme Court. On its second review of the *Batson* question, that court also denied relief. *Puckett v. State*, 788 So. 2d 752 (Miss. 2001). Puckett petitioned the court for post-conviction relief, but that request was denied. *Puckett v. State*, 879 So. 2d 920 (Miss. 2004). Puckett filed his habeas petition with this Court on April 28, 2005, advancing seven grounds for relief.

## II. FACTS

Rhonda Hatten Griffis's husband found her near death, in her home in the Sunrise Community of Forrest County, Mississippi, on October 14, 1995. She had been severely beaten, and

she died a short time later.  One paramedic who treated her at the scene noted a large amount of blood coming from a large laceration to her neck, "pretty much from ear to ear . . . ."  He also observed a large amount of blood coming from a "large crushing-type injury" to the back of Rhonda's head, "with gray matter, brain matter."  Additionally, there was blood coming from her vagina, and she was dressed only in a blood-stained shirt, although some other clothing was wrapped around her left foot.  Rhonda had no pulse by that time, but she was still breathing, although her respiration was described as "minimal."  Apparently, that ceased while she was being transported to the hospital, and the paramedic treating her testified, "[W]e had to breathe for her . . . ."  The doctor who examined Rhonda at the hospital also noted bruising on her hands, face, and ribs.  Attempts to resuscitate her failed, and she was pronounced dead at the hospital.

Dr. Stephen Hayne, who performed the autopsy on Rhonda, testified that the cause of death was cranial cerebral trauma, secondary to blunt force trauma.  Dr. Hayne discovered a multitude of injuries to Rhonda's body, including defensive wounds on her arms and hands.  There were numerous lacerations on her head and face, which were consistent with being struck by a hard, dense object with a rounded edge.  Rhonda also suffered five slash wounds to her neck, none of which would have been lethal.  Dr. Hayne found lacerations at the opening of Rhonda's vaginal vault, as well as bruising within the vault that indicated penetration by a blunt object.

On the day that Rhonda was murdered, her husband, David, took their two boys with him to gather pine straw that was being given to him by Joel Holder, a neighbor who lived about five miles away.  David operated a landscaping business, and he planned to use the pine straw for that purpose.  David had made several trips that day to gather the straw and return it to his home.  The boys went with him on the last trip.  Another neighbor testified that he saw David and his boys at about 4:00

2

p.m. that afternoon. Joel's wife, Becky Holder, testified that David and his boys were at the Holders' for approximately an hour, and that they departed close to 5:00 p.m. She also testified that, at about 3:30 p.m. that afternoon, she saw Puckett pull into her father-in-law's driveway, about 300 yards away. Her father-in-law had parked a truck near the road with a "For Sale" sign on a roll bar in the bed of the truck, and she walked down to the road to talk to Puckett about it.

At the time of the murder, Larry Matthew Puckett, who goes by "Matthew" or "Matt," was eighteen years old. He had worked for David Griffis in his landscaping business until about six months before the murder. David had fired him after a woman from a subdivision in which they were working complained that Puckett had followed her on a walking trail. After he was terminated, Puckett worked at different odd jobs. He had enlisted in the Navy and was to report for basic training in November.

One of the men Puckett worked for was Mark Hicks, an agent with the Mississippi Alcoholic Beverage Control Board. Hicks was driving home on the afternoon of the murder and saw Puckett's truck near Rhonda's home at about 4:40 p.m. Rhonda's mother, Nancy Hatten, lived on the same property as Rhonda and David, in a house about 150 to 175 feet from their trailer. Hatten was in her front yard when she heard a scream and a thud coming from the trailer. She went inside her house to call Rhonda, but got no answer. Hatten started walking toward Rhonda's trailer, and, when she was almost there, she saw David and the two children pulling into the driveway.

Hatten went inside the trailer and was immediately confronted by Puckett, who raised a "club" and started toward her. As Hatten backed away from him, David and the children came through the door. Hatten hurried the children to her house and called 911. Records of that call show that it was placed at 5:01:15 p.m., and it was answered five seconds later. Hatten reported that there

was an intruder in her daughter's home and that she had left her son-in-law with him. After about twenty seconds, the call was placed on hold.

After Hatten left, David confronted Puckett and asked why he was in his house. Puckett told David that he had hit a deer on the road and had come for help and to use the telephone. David called for Rhonda, but Puckett told him that she had gone to Hatten's house. David picked up the telephone and called 911. Records show that this call was made at 5:01:27 p.m., or twelve seconds after Hatten's call. It was answered fourteen seconds later, immediately after Hatten's call was placed on hold. David told the dispatcher who answered the call that there was someone in his house who should not be there, and he identified the intruder as Puckett. The call lasted about a minute, after which it was put on hold while the dispatcher went back to Hatten's call. The dispatcher told Hatten that she was talking to a man in the trailer, and Hatten's call ended after about another minute. The dispatcher then went back to David's call, which lasted for another minute.

During the 911 call, David saw that Puckett had a club in his hand, with blood and "white stuff" on it. He asked him about the blood on the club, and Puckett said it was from the deer. David's 911 call ended at 5:04:42 p.m., apparently as the two men struggled. David ultimately wrested the club from Puckett and managed to pin him down briefly, but Puckett escaped from him and ran out the door. As he did, David swung the club and hit Puckett on the shoulder, then he threw it out the door. David ran to the back of his trailer to look for a gun. When he did, he saw Rhonda on the floor in the den, with blood all over her hair. David called 911 again to report her injuries. Records show that this call was made at 5:05:01 p.m., or about nineteen seconds after David's first call ended. Deputies and paramedics arrived minutes later. Crime scene employees arrived shortly thereafter and began processing the scene.

Puckett was apprehended a short distance from his mother's home on Michael Watkins Road, just inside Perry County, Mississippi, two days later. The Sheriff of Forrest County was present at the arrest. He testified that, when Puckett was arrested, he commented to his mother, "This is a lot of law enforcement for somebody who just committed a burglary." Puckett made no further statement, except to explain how he had survived in the woods for two days. He was examined by the coroner, Dr. Michael West, who testified that a wound on Puckett's shoulder was consistent with being struck by the club that was found at the scene.

The clothing that Puckett was wearing at the time he was captured tested negative for human blood. A rape kit was prepared using samples from Puckett and Rhonda. No evidence of semen was found on Rhonda's body. Crime lab personnel examined hairs collected from the carpet in the den where Rhonda was found, as well as from her body, and none of them matched Puckett's.

Puckett testified at trial and admitted to being in David and Rhonda's trailer on the day she was murdered. He claimed, however, that he had entered the home only to burglarize it, in order to obtain money to make his next truck payment. According to Puckett, he and Rhonda had a sexual encounter in the spring of that year, but he said that it had never occurred again, nor had either of them communicated with the other. When he knocked at Rhonda's door, he said that she let him in and led him into the den. Puckett stated that he asked Rhonda when David would return, and she told him it would be an hour and a half before he got home. Then Rhonda let him act out a fantasy in which he would undress a woman while he remained clothed. After he undressed Rhonda and they were kissing, she saw her mother coming. Rhonda grabbed her clothes, told Puckett to get rid of her mother, and ran into the bedroom.

Puckett admitted to using the club to try to scare Hatten away. He saw David walk in, but claimed that he did not see the children. Puckett said that, after Hatten took the children and left, David realized that Puckett was there to have sex with his wife, who had returned from the bedroom, fully clothed. Puckett testified that David began hitting Rhonda with the club. Puckett grabbed him to make him stop, but David threw him to the floor. He saw Rhonda fall to the floor, and David pulled off her clothes. Puckett tried to run away, but David grabbed him and told Puckett that, if he ever said anything about the incident, the same thing would happen to Puckett's "mama." Puckett admitted to being in the trailer when David made the first 911 call, but he then seized an opportunity to run out of the door. He further conceded that David hit him with the club as he was leaving.

The club that was found at the scene was admitted into evidence. One of Puckett's earlier employers, Ray Watkins, testified that it was the handle from a sixteen-pound maul (a tool similar to a sledgehammer) that had been broken. Watkins stated that he had seen the stick on a couple of occasions in Puckett's truck. Puckett denied that the club was the maul handle, claiming that, while burning trash for another employer, he had made a torch out of it to carry a flame from one trash pile to another.

After hearing all of this evidence, the jury found Puckett guilty of capital murder. During the sentencing phase, Puckett presented several character witnesses to offer mitigation testimony. Susan Greer, his former teacher, Pat Jones, the Superintendent of Education for Perry County, Bill Wall, an inmate chaplain at the Forrest County Jail, Dora Harrington, a family friend, and Lamar Pritchard, a scout leader (Puckett was an Eagle Scout), all testified that Puckett had redeeming character qualities and that he should be given a chance to live. Puckett's mother, Mary Puckett, also asked the jury to spare her son. In response, the State called Katherine Halford, who described the

incident in which Puckett followed her on a walking trail in her subdivision, which led to David's

firing him. Eric Harding, a former co-worker, testified that Puckett resented authority and, on one

occasion, tried to break into a water tower. After about two hours of deliberation, the jury sentenced

Puckett to death.

### III. <u>ANALYSIS</u>

**A.    Standard of Review**

The applicable portions of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Pub. L. 104-32, 110 Stat. 12144, modified 28 U.S.C. § 2254 and now provide:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim -
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the
>> State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, where the state court adjudicates the petitioner's claim on the merits, this

Court reviews questions of fact under § 2254(d)(2), while questions of law or mixed questions of

law and fact are reviewed under § 2254(d)(1). Factual findings are presumed to be correct, and the

Court defers to the state court's decision regarding factual determinations unless it "was based on

an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000); 28 U.S.C. § 2254(d)(2). The Court

independently reviews questions of law and mixed questions of law and fact to determine whether the state court's decision thereon was either "contrary to" or an "unreasonable application of" federal law. *Williams v. Taylor*, 529 U.S. 362 (2000); *Williams v. Puckett*, 283 F.3d 272 (5th Cir.2002); *Hill*, 210 F.3d at 485.

For purposes of this analysis, "federal law" is determined by the Supreme Court of the United States, and this Court must determine whether the state court's decision was "contrary to" or "an unreasonable application of" that established federal law. *Williams*, 529 U.S. at 378, 406; § 2254(d)(1). A state court's adjudication of a claim is *contrary to* clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Robertson v. Johnson*, 234 F.3d 890, 897 (5th Cir. 2000). A state court's application of the correct legal precedent to the particular facts of a petitioner's case will be an *unreasonable application* of the law if it identifies the correct federal law but unreasonably applies it to the facts, unreasonably extends the correct legal principle to a new context where it should not apply, or unreasonably refuses to extend the principle to a new context where it should apply. *Williams*, 529 U.S. at 406. The term "unreasonable," was distinguished in *Williams* from "erroneous" or "incorrect;" thus, a state court's incorrect application of the law may be permitted to stand if it is, nonetheless, "reasonable."

**B.     The Prosecution Violated the Equal Protection Clause by Using Its Peremptory Strikes in a Racially Discriminatory Manner to Remove All African-Americans from Petitioner's Jury.**

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court adopted a case-specific, three-part test by which a defendant could establish that discrimination had occurred in the

jury selection in his case. As a preliminary matter, the defendant must show that the prosecutor's use of peremptory challenges raised an inference that the prosecutor was purposefully excluding members of his race from serving on the jury. *Batson*, 476 U.S. at 96 (This holding has since been extended to members of any race. *Powers v. Ohio*, 499 U.S. 400 (1991)). To do so, the defendant must show that a discriminatory intent motivated the strikes; it is not enough to show that the strikes disproportionately impacted jurors of one race. *Hernandez v. New York*, 500 U.S. 352, 359-60 (1991). Establishing a pattern or practice of strikes against black jurors is one means of establishing a prima facie case, but it is not the only way; showing that jurors of different races were questioned differently may also raise an inference of a discriminatory motive. *Batson*, 476 U.S. at 97. In fact, one discriminatory act in jury selection may be sufficient to establish a *Batson* violation. *Johnson v. California*, 545 U.S. 162, 169 n.5 (2005).

Once the defendant establishes a prima facie case of discrimination, the prosecutor must come forward with a race-neutral explanation for his challenges. *Batson,* 476 U.S. at 97. Because the burden is always on the defendant to prove discrimination, the prosecutor's explanation need not be persuasive; it must only be based on some factor other than the juror's race. *Hernandez*, 500 U.S. at 360. However, the prosecutor must do more than simply deny that he had a discriminatory motive. *Batson*, 476 U.S. at 98. Even if the prosecutor's reasons are frivolous or nonsensical, the analysis does not end, it merely proceeds to the third step. *Johnson*, 545 U.S. at 171; *Purkett v. Elem*, 514 U.S. 765, 769 (1995).

During the third step, the trial court must determine whether the defendant has established purposeful discrimination in the jury selection process. *Batson*, 476 U.S. at 98. At that point, the most persuasive evidence of discriminatory intent can be the demeanor of the attorney challenging

the juror, which is best evaluated by the trial judge. *Hernandez*, 500 U.S. at 365. Strikes based on

a juror's demeanor are also best evaluated by the trial judge. *Snyder v. Louisiana*, 128 S. Ct. 1203,

1208 (2008). However, the judge may also consider other factors; for example, the fact that the

prosecutor defended his strikes without being asked to may be viewed as favorable to his explanation

for the strikes. *Id*. at 370. If the explanation includes reasons that are unacceptable, such as gender,

the trial court is still not required to find that the other reasons are pretextual. *Rice v. Collins*, 546

U.S. 333, 341 (2006).

      Once the trial court has made its determination with respect to discriminatory intent, that

determination is a finding of fact that is entitled to a presumption of correctness. *Hernandez*, 500

U.S. at 364. When a *Batson* challenge is considered in the context of habeas review, the federal

court cannot reject the state court's determination on the issue unless it was "an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." *Rice*, 546

U.S. at 338 (quoting 28 U.S.C. § 2254(d)(2)). If the findings are made by a state appellate court,

rather than by the trial court, they are equally entitled to the presumption of correctness. *Sumner v.

Mata*, 455 U.S. 591, 592-93 (1982); *Moody v. Quarterman*, 476 F.3d 260, 268 (5th Cir.), *cert.

denied*, 128 S. Ct. 88 (2007). However, a finding of non-discriminatory intent must be based on the

actual reasons proffered by the prosecutor; neither the trial judge nor a reviewing court may

substitute a better reason for the strike. *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005).

      In *Miller-El,* the Court recognized several factors that may be considered in evaluating

whether discrimination has occurred. 545 U.S. at 239; *see also Snyder*, 128 S. Ct. at 1208 ("[I]n

considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the

circumstances that bear upon the issue of racial animosity must be consulted."). In *Miller-El*, in light

of widely known evidence that the office prosecuting that case had a long-standing policy to exclude black citizens from jury service, the Court found that the prosecution's striking ten of the eleven available black veniremen was statistically relevant to the claim of discrimination. Additionally, the Court considered the fact that the prosecution had made four requests that the jury be "shuffled" after blacks appeared near the front of the venire. *Id.* at 253. The Court also found that the prosecution made different inquiries of black and white jurors, and, where the same questions were asked, they were worded differently to jurors of different races. Reasons offered by the prosecution for the challenges were discounted by the Court, noting that the reasons applied equally to white jurors who were permitted to serve. *Id.* at 244-47.

Puckett raised the *Batson* issue at trial and on direct appeal to the Mississippi Supreme Court. In reviewing the claim, the Mississippi Supreme Court summarized the racial composition of the venire and the jury as follows:

> Puckett is a white male and his victim, Rhonda Griffis, is a white female. Out of the entire venire totaling 112, there were only eleven (11) blacks. Out of the eleven (11), six (6) were excused for cause, one (1) was excused for medical reasons and the remaining five (5) were excused based on their indication that they could not impose the death penalty under any circumstances.[1] *Accord Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). Consequently, there were only five (5) blacks remaining prior to the exercise of peremptory challenges being exercised. [sic] The State used all 12 of its available peremptory challenges, four against blacks and eight against whites. This resulted in Puckett being tried by an all-white jury, six males and six females.

---

[1]In fact, there were eleven black jurors on the original venire: Mildred Ester, Gloria Hawthorne, Alphonso Hundley, Martha Bridges, Gloria Grayer, Harvey Wesby, Yolanda Preston, James Smith, William Richard, Sylvia Gaddis, and Carl Richardson. Hundley, who had serious health issues, and Smith, who had recently served on a jury, were excused early. Ester, Preston, Richard, and Gaddis were excused after stating that they would never return the death penalty. Hawthorne, Bridges, Grayer, and Wesby were struck by the State. Richardson, who was number ninety-nine in the panel, asked to be excused, but was not. However, he was so far down on the list that his name was not reached during the selection process.

*Puckett v. State*, 737 So. 2d 322, 335 (Miss. 1999).

The court then reviewed the voir dire of the four black jurors whom the prosecution struck and determined that the record was incomplete.  Specifically, the court ruled that the trial judge did not find that Puckett had shown an inference of purposeful discrimination.  The court found that the trial judge also had not made an independent inquiry as to each peremptory challenge and did not make factual determinations as to the reasons for the strikes.  *Id*. at 337.  For these reasons, the case was remanded for an evidentiary hearing.  *Id*.

At the evidentiary hearing, the defense presented evidence regarding the racial makeup of Harrison County, where this case was tried after a change of venue.  According to the evidence presented, blacks made up twenty percent of the population of Harrison County and forty percent of the voters in its First Judicial District, where Puckett was tried.  Thus, the probability of selecting an entirely white jury from that population ranged from .001 (.1%) to .006 (.6%).  Defense counsel then individually challenged each strike of a black juror, arguing that each proffered reason was pretextual.  The prosecution responded to the arguments, and the trial judge ruled that no prima facie case had been established and that, even if it had, the reasons given for the strikes were adequate.

On its second review of this issue, the Mississippi Supreme Court recognized that the trial judge was mistaken in his understanding that Puckett could not avail himself of *Batson v. Kentucky*, 476 U.S. 79 (1986), because he was white and because the jurors excused were of a different race. *Puckett v. State*, 788 So. 2d 752, 756-57 (Miss. 2001) (referred to hereafter as *Puckett II*).  "[T]he pivotal question is 'whether the opponent of the strike has met the burden of showing that proponent has engaged in a pattern of strikes based on race or gender, or in other words "the totality of the

relevant facts gives rise to an inference of discriminatory purpose.""" *Id.* (quoting *Randall v. State,* 716 So. 2d 584, 587 (Miss. 1998), quoting *Batson*, 476 U. S. at 94).

The court further held that, in light of the statistical evidence Puckett presented, as well as the State's striking every available black juror, the trial court erred in finding that Puckett had not made out a prima facie case. *Puckett II*, 788 So. 2d at 758.[2] Since Puckett had established a prima facie case of racial discrimination, the burden shifted to the prosecution to articulate race-neutral reasons for each strike. *Id.* Even though the court found that a prima facie case had been established, its review of the reasons given by the State for each strike convinced the court that they were "'neutral,' related to the particular case tried, and supported by the record." *Id.* Thus, the conviction and sentence were affirmed. Having been raised and determined on direct appeal, the issue was not advanced again during the post-conviction proceedings.

Puckett's claims were premised on the prosecution's striking Gloria Hawthorne, Martha Bridges, Gloria Grayer and Harvey Wesby from his jury. However, he raises only two claims of discrimination before this Court – the striking of Gloria Hawthorne and of Harvey Wesby. His arguments supporting these claims were summarized in his rebuttal brief, as follows:

- At the time he exercised strikes against Mr. Wesby and Ms. Hawthorne, the prosecutor was admittedly ignorant of the fact that his actions were subject to the rule of *Batson;*

- The prosecutor struck every available black prospective juror from the venire;

_____

[2]The Supreme Court has held that, if the prosecutor offers an explanation before the trial judge determines that the defendant has established an inference of discrimination, as happened in Puckett's case, then that showing becomes moot, and the judge should rule on the ultimate issue. *Hernandez v. New York*, 500 U.S. 352, 359 (1991). Puckett mentioned *Hernandez* in his brief on his second appeal, but did not argue this principle to the Mississippi Supreme Court.

- The likelihood of seating an all-white jury in the absence of discrimination was statistically minute;

- The main rationale relied upon by the prosecution and accepted by the Mississippi Supreme Court – that Mr. Wesby and Ms. Hawthorne contradicted their questionnaires by failing to respond to a *voir dire* question that was never actually asked – is utterly without record support.

- The prosecutor's purported concerns about Mr. Wesby's and Ms. Hawthorne's responses are flatly belied by his failure to remove or otherwise express the same concerns about similarly situated white jurors;

- The prosecutor's purported concerns – particularly with regard to Ms. Hawthorne, whose questionnaire showed clear support for the death penalty – are further belied by his failure to pose followup questions to clarify any ambiguities he may have perceived; and

- The prosecutor's modification and supplementation of his reasons for striking Mr. Wesby and Ms. Hawthorne at the hearing on remand was a transparently *post hoc* attempt to avoid detection of the *Batson* violation committed at trial.

Each of these contentions may be analyzed applying the rationale of the cases already discussed. First is Puckett's assertion that the prosecutor was not aware of the effect of *Batson* on a case involving a white defendant. The record indicates that both the prosecutor and the trial judge misapprehended *Batson's* application to such a case and were, apparently, not aware of *Powers's* express declaration that *Batson* applied, even after this case was remanded for an evidentiary hearing. That situation is not dispositive of the outcome here, however, so long as the law was

properly applied, even if the State was unaware of it. As the United States Supreme Court has recognized, a state court's decision may avoid AEDPA review without citation to the proper cases, or even awareness of them, "so long as neither the reasoning nor the result of the state court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Here, it is clear that the prosecutor did not know that *Batson* applied to the jury selection in Puckett's case. However, at the first challenge to a peremptory strike, he acknowledged a mistaken belief that, while Puckett could not challenge the removal of black jurors, he might be able to challenge the removal of white ones. Thus, he proceeded to give reasons for the removal of each juror, and Puckett was not prejudiced by the prosecutor's mistake.

Puckett next asserts that every black prospective juror was removed from the venire, which is established by the record, and that the odds of seating an all-white jury in the district where he was tried were minute. These facts were considered by the Mississippi Supreme Court in *Puckett II*, and the court there held that they did not create an inference of purposeful discrimination. *Puckett II*, 788 So. 2d at 757-58. They were, however, factors that the court considered in finding that Puckett had established a prima facie case. *Id*. at 758. The state court's treatment of this issue is consonant with United States Supreme Court precedent. In *Miller-El II*, the Court noted the prosecution's striking of nineteen of twenty available jurors at trial, but did not base its ultimate finding of discrimination on that issue. *Miller-El v. Cockrell*, 545 U.S. 231, 240-41 (2005). Instead, the Court focused on comparing the black panelists who were stricken against the white panelists who served, finding that evidence "more powerful than . . . bare statistics . . . ." *Id.* at 241. Having reached the stage where a prima facie case has been acknowledged in this case, these facts have limited relevance

to resolving the ultimate issue of racial discrimination, and the Court is not persuaded they support Puckett's claim.

The next issue raised by Puckett is whether the prosecutor relied on alleged "discrepancies" between Hawthorne's and Wesby's questionnaires and voir dire responses that did not actually exist. Puckett argues that the questions asked by the prosecution on voir dire were not designed to elicit answers from either juror that would have further clarified their positions on the death penalty. In order to fully consider this issue, it is necessary to review the entirety of the voir dire as it related to death penalty qualification of the jurors.

It is well established that the State cannot exclude jurors from service merely because they have conscientious scruples against the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 522 n.21 (1968). The Court later refined this test to require that such a juror should be subjected to additional voir dire to determine whether his scruples "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). If that is the case, then he may be properly excluded. The reverse is also true; a defendant may challenge a juror who would automatically impose the death sentence for any capital murder. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). In either case, the party seeking exclusion of a juror for bias in favor of or against the death penalty must demonstrate that bias through further questioning, which should be permitted by the trial court. *Morgan v. Illinois*, 504 U.S. 719, 734 (1992); *Lockhart v. McCree*, 476 U.S. 162, 170 n.7 (1986).

Here, after questioning the jurors on other areas of bias and hardship, the trial judge told the jury that he and the attorneys had reviewed their questionnaires, which sought their opinions of the death penalty. He then made the following statement to the group:

> Do any of you want to expound on what you put on your questionnaires concerning the death penalty? We will have to probably hear from you. We will probably do it here at the bench rather than go to chambers. We will use that procedure to begin with. If it gets too unruly or too out of hand, we will go to chambers. I hesitate to let you speak up in the presence of everybody else because you could say something prejudicial that will cause me to have to quash this jury panel. What we are going to do at this time, I am going to ask the Defendant, Defense attorney and State's attorneys to join me at the bench and then if you will, come down one at a time and giving [sic] us your number as you come down. If any of you want to expound on anything that you had to say about the death penalty in addition to what you had in your questionnaire, we will try that first. Then we will let the State voir dire you. He has indicated that he would use the death penalty first. Before we get to the State's posture, if any of you want to add anything – is there anyone that wants to add anything to what they had in the questionnaire?

No one answered, so the judge turned the questioning over to the prosecutor, who announced the following method for questioning people:

> I want to question you in, I guess, about three different sections; one, you have people that have a firm opinion about the death penalty; you have other people who have the firm opinion against the death penalty and you have a lot of people that are in the middle.

He then inquired, row by row, whether any jurors had a firm opinion about the death penalty. The judge interrupted him briefly, and the prosecutor then asked jurors to indicate "if you have a firm opinion in favor of the death penalty when inflicted according to law . . . ." The judge again interrupted and asked the prosecutor whether he intended to ask for firm opinions either for **or** against the death penalty. The prosecutor responded, "Right now I am going into the ones that are for it and – I will take it in three segments." The judge thought the jurors did not understand that, prompting another explanation from the prosecutor:

There are three segments.  I will take number one, those of you that are pro death penalty, have your minds made up that you could vote for the death penalty if the evidence justifies it.  Then I will go to those who could not; then I will go to those who are in between.  Are we okay?  Does everyone understand?

Several jurors responded, and one asked him to clarify the question.  Once more, the prosecutor said:

I am going to get – what I am trying to reach is just the ones that have a firm opinion that they could vote for the death penalty, of course, if the facts warranted it.  Then I am going to those that oppose; then I am going to those in the middle.  There is usually a lot of people in the middle that have different and varying degrees about it.

At this point, defense counsel objected and asked the court to take responding jurors to

chambers for individual voir dire.  He also asked that the prosecutor clarify his question, and he

rephrased it as follows:

Let me clear it up.  Maybe I didn't phrase it right.  I am talking about people who believe in the death penalty if the evidence, in fact, justifies it.  I certainly do not want to give anybody the death penalty without the evidence.  But if the evidence justifies it, that is what I am talking about, people who are in favor of the death penalty . . . .

Several jurors responded to this question as it was asked in the forms quoted above, but neither

Hawthorne nor Wesby responded.  The prosecutor went further with the jurors who had answered

affirmatively:

Now those of you who have indicated that you do believe in the death penalty if the facts justify it – in other words, is there anybody who just automatically, even though you believe in it, will just automatically vote for it regardless of what the facts might be; or do any of you have an opinion that strong, who are pro death penalty, that regardless of what the facts might be, you would just automatically vote for it; you cannot consider any other punishment is what I am getting at.  Do any of you have an opinion about the death penalty that strong, anyone?

So each of you tell me – those of you who have indicated that you favor the death penalty, if the facts and evidence justify it, that you would consider all of the forms of punishment before imposing whatever you felt should be just punishment.  Do all of you tell me that you could do that?  In other words, open-mindedness even

though you favor the death penalty, are you willing to be open-minded and consider all of the facts, all the evidence, the instructions of the Court and consider all forms of punishment before you render whatever your verdict might be? Is there anybody that cannot do that?

The record shows no response to that question. The prosecutor then announced that he was going to go "row by row on those who feel in their mind that they oppose the death penalty." He began calling out juror numbers, apparently based on their questionnaire responses, and asked the following question:

Those of you who have indicated that you have an opinion that you do not – that you do oppose the death penalty, not in favor of it, do any of you with that belief feel that you would automatically not render the death penalty regardless of what the facts and circumstances are?

Defense counsel objected to the phrasing of that question, and raised another matter, and a conference in chambers ensued. A long discussion followed, in which defense counsel, at one point, argued that he should be able to individually voir dire any juror based on his questionnaire responses, "when they say they love the death penalty, or they like the death penalty, or something along those lines." The trial judge held that the prosecutor's questioning was proper under the language of *Witherspoon*, not mentioning *Witt*. Again, the prosecutor told the court that he was seeking to identify jurors with a fixed opinion for or against the death penalty. "Then I will get to the in between where you have a lot of individuals with differences." The argument evolved to a question of whether the jury understood that the proceedings would be bifurcated and that the sentencing issue would not arise unless they returned a guilty verdict, and the prosecutor agreed to make that explanation.

Following his explanation of the bifurcated proceedings, the prosecutor said:

Then if you get to the punishment stage, of course, then you get to determine whether or not the death penalty can be inflicted.  I have already asked those of you who have a fixed opinion about the death penalty whether or not you could consider any punishments before you would vote to inflict the death penalty.  Do each of you tell me that you could do that?  Is there anybody that couldn't do it?  And that you will invoke whatever punishment that you feel the facts justify; that is the whole issue is what the facts justify.  Can all of you tell me that you can do that?

Now, is there anyone whether or not you had a fixed opinion for the death penalty or a fixed opinion against the death penalty that could not be set aside – would not let your fixed opinion interfere with your duty to deliberate and consider the facts of the case and render a fair verdict?  Does anybody have that feeling?

Several jurors stated at that point that they could not return the death penalty under any circumstances.  Again, neither Hawthorne nor Wesby responded to the question.

Shortly thereafter, defense counsel began his voir dire by asking whether any jurors had a connection to law enforcement.  Wesby responded to this question by stating that he had a friend who had retired from the Gulfport Police Department.  When defense counsel began asking jurors whether they had conscientious scruples against the death penalty, the trial judge announced that further questioning would proceed in chambers.  Several jurors responded and were stricken for cause under *Witherspoon*.  Defense counsel then announced that he wanted to "revisit" other jurors who had "expressed a very strong fixed opinion in favor of the death penalty."  Most of these jurors had indicated their opinion during the State's voir dire; some were apparently chosen on the basis of their questionnaire responses.  Neither Hawthorne nor Wesby was among that group.

At the conclusion of his voir dire, defense counsel asked this final question, "Is there anything – does anybody, from whatever we have discussed, is there anything in anybody's mind – that is terribly important – that makes them feel that they could not be impartial and fair and open minded?  Anything?"  No juror responded.  Following this, the attorneys, Puckett, and the trial judge

retired to make the jury selection.  When the prosecutor reached Gloria Hawthorne, the second black

juror whose elimination is at issue here, the following colloquy occurred between prosecutors (Jones

and Helfrich) and defense counsel (Adelman is defense):

MR. HELFRICH:     S2 would be Gloria Hawthorne; she was not responsive on her questionnaire; she was one way and not responsive in open court; on her off days, she likes to sleep half the day; I don't think she would be attentive.  S3.

MR. ADELMAN:     Before we move from S2, note for the record that Gloria Hawthorne is a black female.

THE COURT:     In anticipation of *Batson*, I did not delineate in this record, the racial or gender composition of this jury, and I don't know that any – did any of you make that notation?  I take your word for it, but I would just say –

MR. ADELMAN:     I made the notation.

MR. JONES:     If the Court please, we think it will be a reverse back for both sides.  Because the Defendant is white, it is going to be not only the black but the white; that is why we are going to give them on everyone.  We ask they do the same.

THE COURT:     What I am saying is, when we get the jury back from the luncheon recess, we will have to distinguish in the record that, because we don't have that in the statistical records before us and I did not make that notation.  I did not anticipate a *Batson* motion, but we will do that after the luncheon recess.

MR. ADELMAN:     Our position is that the reason given is not sufficiently a race neutral reason.

MR. HELFRICH:     The fact that she sleeps half a day when she is off.  I am afraid she will be sleeping here.  She was not responsive to questions.

MR. JONES:     She was not responsive to the death penalty questions, and her questionnaire is totally different in regard to the death penalty.

THE COURT:     Let me ask you this: Since I did not make that determination in anticipation of *Batson*, can we all agree that she is a member of the African-American race for this record?

MR. HELFRICH:     It is on the questionnaire.

MR. ADELMAN: On her questionnaire, there is no issue about it. First of all, on her off time, she can sleep 100 percent of the time. There is no indication that it has ever interfered with her employment. She is fully employed. As far as death penalty, she stated, "I feel that if you take another person's life and the Court can prove that you did it, then you should get the death penalty."

MR. JONES: If the Court please, our objection on the death penalty goes back, in open court, she was totally unresponsive, because she didn't indicate when we asked if she was for the death penalty; and she was totally unresponsive to our voir dire, and it is contradictory to what she says in her questionnaire, and for that reason we feel it is race –

MR. ADELMAN: His question on the voir dire was whether or not they could put aside any feelings they had and view the evidence in light of the law.

THE COURT: The Court is of the opinion that cause has been exercised without regard to race or gender and as such would not be challenged under *Batson*. Who is next?

When the prosecutor got to Harvey Wesby, the following exchange occurred:

MR. HELFRICH: Juror 43, we will strike, Harvey Wesby.

THE COURT: S-10.

MR ADELMAN: Your Honor, for the record we note that Mr. Wesby is a black male. They have now struck all four blacks on the jury panel.

THE COURT: Let me hear your reasoning on the strikes.

MR. HELFRICH; For the record, Your Honor, the Defendant – before I get into my reasoning, the Defendant is white and the victim is white. I don't know if that has been clear in the record; I would like that in the record. On his questionnaire, where he says he is pro – on the death penalty "It's okay." He is flippant, and he was not responsive to the question in open court, and for those reasons we would strike him.

MR. ADELMAN: For the record, under *Batson* and subsequent progeny including *Powers v. Ohio*, it is irrelevant whether or not the Defendant is white and the victim is white. We submit that Mr. Wesby in his questionnaire is totally open; he said the death penalty was okay. I would like to know what is flippant about that. He works regularly in shipping and receiving. They have not given a race neutral reason.

22

MR. JONES:   If the Court please, his answer on here, he says, It is okay. He did not respond in court about the death penalty. The death penalty is a race neutral reason to strike based upon that, and I am satisfied with the response.

MR. ADELMAN:  Mr. Jones asked; were there any jurors who could not set aside whatever their opinion was and apply it to the facts and law.

THE COURT:  The Court is of the opinion that strike was not based along racially motivated lines and as such will not be excluded under *Batson*.

As stated earlier, the Mississippi Supreme Court initially remanded this case for another

*Batson* hearing, holding:

> The inference of purposeful discrimination was not automatically invoked in this case. The trial judge did not make a ruling that Puckett had established this inference. The trial judge did not make on-the-record factual determinations and inquiry independently as required by *Hatten*[3] regarding each peremptory challenge. We therefore remand this issue for a properly conducted *Batson* hearing in accordance with this opinion.

*Puckett I*, 737 So. 2d at 335-37.

Such a hearing was held, and counsel for the defendant argued that the reasons given by the

State were pretextual. The prosecutor responded as follows:

MR. HELFRICH:  Your Honor, it's important to know, and I want the record to be perfectly clear, that in this case you've got a white victim, you've got a white defendant . . . . Mr. Adelman says that Gloria Hawthorne should not have been stricken. We stated that her answers were unclear on the death penalty . . . . Mr. Adelman was trying to compare her questionnaire with the questionnaire of Danny Earl Griffin, who was selected. Ms. Hawthorne stated she felt that if you take another person's life and the court can prove you did it, then you should get the death penalty. Danny Earl Griffin, which is Exhibit D-7, stated he agreed with the death penalty as long as there's certain proof. As you're well aware, Your Honor, the Court does not prove anything. The State of Mississippi has the burden of proof, but it's not the Court. She was uncertain and not clear as to what's required. Further, during the voir dire that was conducted by Rex Jones, she was asked

_____

[3]*Hatten v. State*, 628 So. 2d 294, 298 (Miss. 1993).

questions about her feelings on the death penalty, and she did not respond in open court.

. . . .

Now, Mr. Wesby. And when this case was argued before the Supreme Court, they questioned my use of the term "flippant," which I probably should not have used, but Mr. Wesby, on his questionnaire, as to his opinion of the death penalty, it was simply, "It's okay." When Mr. Wesby was questioned in open court as to whether or not he could impose the death penalty, he did not respond by raising his fan to the question, and that's what we meant when we used the word "flippant." He answered the questionnaire one way and would not respond in open court or responded in an opposite way in open court. . . . . I think Justice McRae didn't like the word "Flippant," but what we meant by using "flippant" was that he responded one way on his questionnaire and responded the opposite way in open court, when he was questioned. And that's why he was struck.

Defense counsel later responded:

MR ADELMAN:        And there are lots of – in reviewing the transcript, when Mr. Jones asked questions about opinions on the death penalty, I'd say that the vast, vast majority of potential jurors at that point said nothing, and somehow for Mr. Wesby and for Ms. Hawthorne, the fact that they added nothing, said nothing different than what they had submitted in their questionnaire is being reinterpreted to have some kind of significance beyond the fact that they were standing on what they put in their questionnaire, just like most of the jurors. I mean, this is a problem we all face in jury selection, is that a lot of the jurors, the members of the venire tend not to answer questions, particularly if they are addressed in a group. And I submit that implications, adverse implications are being drawn from their silence which weren't drawn from the silence of, say, Mr. Griffin. I saw nothing in the voir dire where Mr. Griffin said anything about the death penalty, other than what he had put in the questionnaire.

After other discussion, the prosecutor added:

MR. HELFRICH:        And as to Ms. Hawthorne, Your Honor, as we stated at trial when we made that strike, another thing that concerned the State was her answer that when she's away from work, she likes to sleep half the day. Well, serving on the jury, she's going to be away from work, and we were also concerned about that answer.

24

After a brief recess, the trial judge made the following ruling:

> As I understand and appreciate the matter that is before the Court today, this matter has been remanded to this Court solely for a <u>Batson</u> hearing. That being the case, I think that we all realize that in any <u>Batson</u> hearing it must first be shown that a prima facie case of purposeful discrimination exists, and that the three-prong criteria under the <u>Batson</u> express terms, that the defendant raising a <u>Batson</u> claim must show, number one, that he is a member of a cognizable racial group, and I think that would be the same of a gender group; number two, that the prosecutor has exercised peremptory challenges toward the elimination of a venire by his race, and I think and/or gender, and, three, that the facts and circumstances in further prosecuting his peremptory challenges for the purpose of striking minorities. Obviously, the prima facie case has to be shown before it would trigger the State moving forward. I am of the opinion based not only on a review of the trial transcript and a review of my trial notes taken during the course of the trial, as well as the evidence produced in this evidentiary hearing today, that the defendant has not met that prima facie case. And that being the case, it would not be necessary for the State to move forward to show their reasonings behind the strikes. Notwithstanding that, the State, as I understand, initially put some of those reasons in the record during the trial. I understand the Supreme Court has said that all this Court needs to do is determine whether or not there's a prima facie case without making reference to the reasonings, and thereby ruling that since they haven't met the prima facie case, it's not necessary to give those reasons. However, I will say that had that existed, by a review of what this Court has seen, that those reasons given by the State were not racially or gender motivated reasonings. And that's probably just surplusage in this record. The Supreme Court certainly didn't direct me to do that, but I would say for the sake of this record, for whatever purposes it is worth to the appellate court, that had this Court ruled that <u>Batson</u> did exist, that one step further would have been a ruling by this Court that those were racially and gender neutral reasons for striking those individuals.

Although the trial judge found no inference of discrimination, the Mississippi Supreme Court reversed him on that issue. *Puckett II*, 788 So. 2d at 758. The trial judge then apparently made an alternate finding that the proffered reasons for the strikes were racially neutral, and the appellate court affirmed that finding. *Id*. Puckett argues that no such finding was made, as the judge's findings went only to the second part of the *Batson* test – that the reasons were race neutral – and not the third part of the test – that they were not racially motivated. He further argues that, even if the

third-part findings were made, their affirmance was an unreasonable application of federal law on this issue.

In applying the law to this case, the Court must first determine what findings were actually made by the trial court or the appellate court, since there is a dispute among the parties. Puckett argues that, on remand, the trial judge only found that the reasons advanced for the strikes were race neutral. Thus, he argues, the Mississippi Supreme Court erred in deferring to the trial judge's determination that the reasons were not pretextual, because that finding was never made. Respondents disagree, pointing to two statements made by the trial judge. The first was made immediately after he determined that a prima facie case of discrimination had not been established. "However, I will say that had that existed, by a review of what this Court has seen, that those reasons given by the State were not racially or gender motivated reasonings." Shortly thereafter, the judge added, "[H]ad this Court ruled that <u>Batson</u> did exist, that one step further would have been a ruling by this Court that those were racially and gender neutral reasons for striking those individuals."

Respondents argue that the second statement was a finding on the second *Batson* test – that the reasons offered for the strikes were race neutral. They also argue, however, that the first statement was a finding on the third test – that the reasons were not a pretext for racial discrimination. Puckett disagrees, contending that the context of the first statement shows that the judge was just proceeding from the first part of the *Batson* test – a finding of an inference of discrimination – to the second. His interpretation of the judge's statements is not supported by the record. The third part of the *Batson* test requires the defendant to show "purposeful discrimination." *Miller-El*, 545 U.S. at 277. Thus, the prosecutor's explanation must go beyond a facially neutral reason and demonstrate that he did not intend to use his strikes in a discriminatory manner. By

ruling that the reasons given for the strikes "were not racially or gender motivated," the trial judge made a finding on the third prong of the *Batson* test.

Even so, the trial court's ruling must rest on a factual foundation that is supported, or, at least, not negated by the record. With regard to Gloria Hawthorne, the prosecutor gave as one of the reasons for striking her that she liked to sleep half the day when she was off work and the prosecutor thought she would be inattentive. There is nothing in the record to suggest otherwise, and there is no indication that white jurors with similar responses were unchallenged. The second reason given for striking Hawthorne, and the only reason given for striking Wesby, merit further examination.

The prosecutor maintained that questionnaire responses of these two jurors on the death penalty were somehow at odds with their responses, or lack thereof, given during voir dire. The record does not fully support that contention, and striking Hawthorne or Wesby on this basis could run afoul of two factors that *Miller-El II* concluded would support a finding of discriminatory purpose. First, Hawthorne and Wesby were treated differently than similarly situated white panelists who were not challenged, which is, as *Miller-El II*, announced, "evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." 545 U.S. at 241. Second, the Court in *Miller-El II* faulted the prosecution's failure to further question black jurors, stating, "'[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'" *Id.* (quoting *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000)).

Hawthorne's response to the death penalty question was, "I feel if you take another person's life and the Court can prove that you did it, then you should get the death penalty." Wesby responded, "[I]t's okay." Puckett argues that three white panelists who served on the jury had

questionnaire responses similar to Hawthorne's and Wesby's. In particular, Danny Griffin responded, "I agree with it as long as there is certain proof." Steve Savarese said, "I feel it should be used for capital offenses." Lavern Moran stated, "I believe in it." In addition to Puckett's argument, the record shows that other panelists who served had responses that were somewhat ambiguous. Susan McKnight answered, "I believe the death penalty needs to be enforced to let others know that murder is wrong." Shantel René Swilley stated, "I like it." Jerry Parker, who served as an alternate, said, "I believe in it when the crime calls for it."

In addition to the jurors listed above, other panelists who did not serve had views on the death penalty that were similar to those of Hawthorne and Wesby. Richard Olson said, "For murder only, yes!" Dewey Turnage answered, "If crime warrants it, it should be carried out." Herman Grimes said, "Necessary when the crime calls for it." Joseph Holcomb said, "<u>Yes</u>." Jesse Stephenson wrote, "If someone is convicted of first-degree murder then that person should receive the death penalty." Angela Thomas stated, "If someone kills another human being I feel their life should be taken also." When the prosecutor asked, at the beginning of his voir dire, whether any juror had a firm view in favor of the death penalty, Turnage, Swilley, Parker, Stephenson, Holcomb, and Thomas raised their hands. Hawthorne, McKnight, Olson, Grimes, and Wesby failed to respond. None of these jurors was questioned at that time. The prosecutor re-phrased his question and asked whether, of those who favored the death penalty, there were any who would not consider other forms of punishment. Apparently, no one responded. Then he asked for a showing of hands of those who opposed the death penalty. After an objection, a lengthy conference was held in chambers. Several jurors indicated that they were opposed to the death penalty, but none of the jurors listed above responded. There was no follow up questioning on this subject from the prosecution.

Defense counsel began his voir dire on other subjects, but ultimately moved to questioning on the death penalty, individually examining the jurors who had indicated a fixed opinion against the death penalty. Then he questioned jurors who, in his opinion, had indicated that they had strong feelings in favor of it. During that questioning, McKnight, Olson, Turnage, Swilley, Grimes, Stephenson, Parker, and Holcomb were asked to further explain their answers. Neither the two black jurors, Hawthorne and Wesby, nor the jurors discussed in Puckett's petition, Griffin, Savarese, and Moran, were questioned by the defense. All of the questioned jurors were retained, except for Holcomb and Thomas, who were successfully challenged by defense counsel for bias. Olson was later excused for another reason. McKnight, Griffin, Savarese, Turnage, Swilley, Moran, Grimes, Stephenson, and Parker were all tendered by the prosecution.

This summary of questionnaire responses shows that there were several prospective jurors whose views on the death penalty were somewhat ambiguous, but whose responses indicated they were in favor of imposing it. Two of those jurors, Hawthorne and Wesby, who were black, were struck on grounds that they were unresponsive to questioning on the issue. Some of the white jurors in this group were similarly unresponsive to questioning by the prosecution. In *Miller-El II,* the Supreme Court said that disparate questioning of similarly situated jurors is a factor indicating discrimination, particularly where the prosecutor failed to engage black jurors in meaningful voir dire on the areas of concern. *Id.* at 246. However, *Miller-El II* did not hold that a prosecutor must, in all circumstances where he is concerned about an issue regarding a juror, conduct additional questioning. Instead, it held that a *failure* to conduct further voir dire is a factor that may suggest discrimination in a case where the record supports a claim of pretext.

The Supreme Court has also cautioned:

[A] retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.

*Snyder v. Louisiana*, 128 S. Ct. 1203, 1211 (2008).

Here, categorizing all of these jurors as similar based on their questionnaire responses is a purely subjective exercise, even if it is limited to the three white jurors whom Puckett has identified. This is particularly difficult in this case because the disparities about which Puckett now complains were not raised at trial. Given the rigorous standard for habeas review, this Court cannot conclude that the state courts unreasonably applied federal law in this context. It is clear that the State did not proceed to question any individual jurors whose questionnaires did not express a clear view of the death penalty. While the Respondents could rely on the examination by defense counsel to clarify the views of most of those jurors, neither Griffin, Savarese, nor Moran was individually questioned by either side.

Nevertheless, Puckett's argument fails because there were two other white jurors who *were* challenged by the State, and who fall into the category of jurors whose questionnaire responses, although not entirely clear, indicated a willingness to impose the death penalty under certain circumstances. Carol Fullilove, who was apparently a white female, responded that her opinion of the death penalty was "It depends on the crime." She did not respond to any of the questions propounded by the attorneys on the death penalty, and she was not called for individual voir dire by either side. As grounds for the strike, the prosecutor said she was "totally unresponsive" in open court. The State also struck June Ladner, another white female, because her answers were unclear. On her questionnaire, she wrote something and marked it out, then stated, "Depends on case."

Ladner had responded positively to the prosecutor's question on who was in favor of the death penalty, but she was never individually questioned.

Puckett's claims notwithstanding, resolving them in his favor would require the Court to engage in subjective speculation as to whether the questioning during voir dire was such that Hawthorne and Wesby should have responded, while white jurors had no such requirement. It would also require that the Court place jurors into groups that could be categorized as similar based on their responses to an open-ended question about the death penalty. Perhaps most importantly, finding a *Batson* violation here would require the Court to ignore the fact that two white jurors were also struck by the State for failing to come forward with additional information on their death penalty views, the very same reason given for striking Hawthorne and Wesby. For these reasons, Puckett is not entitled to habeas relief on this issue.

**C.    The Prosecution Violated Petitioner's Due Process Rights by Repeatedly Impeaching His Post-*Miranda* Silence and Arguing that No Innocent Man Would Forego the Opportunity to Tell His Exculpatory Story to the Police.**

Sheriff Billy Magee was present when Puckett was arrested, and he testified that Puckett said that there was a lot of law enforcement present for someone who had just committed a burglary. A deputy, Eddie Clark, testified that Puckett was given a *Miranda* warning once he arrived at the police station, after which he made a similar comment and then refused to make any further statement. Clark testified that, later that evening, after a second *Miranda* warning, Puckett described how he had evaded law enforcement for two days. He then added that he did not kill anyone, but had gone into the residence to get money to pay a truck note.

Puckett testified at his trial and told the jury that he had intended to burglarize the Griffis home, but was let in by Rhonda. According to Puckett, Rhonda's mother and then her husband

discovered him there, and David Griffis concluded that Puckett was there to have sex with Rhonda.

At that point, David began hitting Rhonda with a club, and he warned Puckett that, if he told anyone,

the same thing would happen to Puckett's mother.

On cross-examination, the prosecutor challenged Puckett's story, particularly its recency.

The questioning was as follows:

> Q.      Well, I want you to tell me one thing.  If you had just witnessed a man brutally beat
> his wife to death, why didn't you go right on to your mother's house and say, Call the
> police; let me tell you what's happened?
>
> A.      Because my mama's car wasn't there at the time.
>
> Q.      Well, you didn't even stop and go to the house, did you?
>
> A.      No, sir.
>
> Q.      Why didn't you go to Buck Hinton's house, good people, and say, Let me tell you
> what's just happened?  I watched David Griffis beat his wife to death.  Call the
> police.
>
> A.      They were a long ways away from my house.
>
> Q.      Well, why didn't you go to the Police Department or the Sheriff's Office?  You knew
> where that was, didn't you?
>
> A.      No, sir.
>
> Q.      You don't know where the Sheriff's Office is?
>
> A.      I do now, but I didn't before.
>
> Q.      And you didn't go to anybody nowhere on this earth and say, Look, I want to tell you
> something; I just witnessed David Griffis beat his wife to death.  You didn't do that,
> did you?
>
> A.      No, sir.
>
> Q.      I want you to tell me why.

A.	I was afraid, and I was trying to hide from him.

. . . .

Q.	And you didn't go anywhere and tell anybody about this big thing you witnessed, did you?

A.	No, sir.  I was just concerned about getting away from him.

. . . .

Q.	And you admit under oath, is it not true, that when you came out of the woods – and Sheriff Billy McGee came here and said that you made the statement, this is a lot of police for breaking and entering; that's true, isn't it?

A.	No, sir.

Q.	You didn't tell your mother that?

A.	No, sir.

Q.	You're denying that?

A.	I deny that.

. . . .

Q.	And do you admit or deny you told Eddie Clark, when he took a statement from you, that it was a lot of police for breaking and entering?

A.	No, sir, I did not say that.

Q.	Well, you told Eddie Clark about going there to get money for your truck note, didn't you?

A.	I told him that it was my intent to do so.

Q.	Well, that part's true, isn't it?  But you deny the bad part, that you went there to break and enter.  You deny telling him that?

A.	I don't deny that it was my intent to do so, and I don't deny that I had said that to him.

Q.     Well, when the police apprehended you – and there was all kind of police there, wasn't it?

A.     Yes, sir.

Q.     I'm going to ask you again on another area, I mean, helicopters, dogs, all the protection in the world from David Griffis, wasn't it?

A.     Yes, sir.

Q.     Why didn't you tell them what you'd just seen?

A.     Because my mama was there, and she told me to keep my mouth shut.

Q.     Oh.  If you saw David Griffis beat his wife to death with this club, the reason you say you didn't tell the police when they were all around you – you had hundreds of them there, didn't you?

A.     Yes, sir.

Q.     And they could have protected you from David Griffis, couldn't they?

A.     Yes, sir.

Q.     Your mother told you to keep your mouth shut?

A.     Yes, sir.

Q.     Did you tell her about this, what you saw?

A.     Not right off the bat, I did not.

Q.     Who is the first person you told that story to?

A.     My lawyer.

Q.     And when was that?

A.     I don't have the date.

Q.     How long – when was it you told him this story you've told here today?  How long after it happened?

A.      I couldn't give you a time.

Q.      Here we go again.  I want you to think.  Now, how long was it after October 14, 1995, that you told this version you've given here today for the first time?  When was it – to anybody on God's earth?

A.      I don't know.

Q.      Was it a month later?

A.      I don't believe it was that long.

Q.      But you can't tell us.  But you waited at least a month before you told anybody, and you told your lawyer, isn't that right?

A.      Yes, sir.

Q.      And never, ever has this story you're telling today been told to anybody other than your lawyer until today, has it?

A.      My father and my mama knew about it.  I had told them.

Q.      Well, when did you tell your mother?

A.      The same time I told my lawyer.

Q.      Well, now she told you to shut up, right, and not tell the law enforcement anything?

A.      Yes, sir.

Q.      And if you're an innocent man, I mean, they're telling you to shut up and don't tell anybody?

A.      That's what my mama said.

Q.      And you're innocent, you say?

A.      Yes, sir.

Q.      And your mother told you not to tell about your innocence, just keep your mouth shut, right?

A.      Yes, sir.

Q.    And did you tell her then about what happened?

A.    When she said to be quiet, no, sir, I didn't.

Q.    Well, did you tell her later that day or the next time you saw her?

A.    I told her the same time I told my lawyer.

Q.    Well, tell us when that was.  I want to know when it was you told your mother and your lawyer the version you've given here today.

A.    Like I said, I couldn't give you a date.

Q.    Well, you can remember quite a few things pretty accurately, but you can't give us the best date of when you told them?

A.    No, sir.

Q.    Well, I know one thing; you haven't told anybody other than your mother and your lawyer on God's earth till today, have you?

A.    I was told to keep quiet.

Q.    Keep quiet.  An innocent man, who'd done nothing and witnessed a murder?  They told you to keep quiet?

A.    Yes, sir.

Q.    Why would they do that?

A.    That was my mother and my lawyer, and that's what they instructed me to do.

Shortly after these questions, defense counsel approached the bench and asked to be heard. In a conference in chambers, he objected to the line of questioning, arguing that it was "getting into attorney/client relationship."  The prosecutor replied, "I was trying to establish when he first told somebody – not what he told them.  I have enough; I am not going further."  Defense counsel said, "I did not want the record to leave the implication until he elects to take the stand – he has a right to remain silent."  The prosecutor explained, "He witnessed a murder; I want to know when he told

somebody. I think his credibility – to his credibility." During closing argument, one of the prosecutors made the following statement:

> Puckett wants you to believe David did it, yet he ran. He ran. He hid his truck in the woods. He stayed in the woods some hundred yards from his mother's house for two days, until they finally tracked him down. He claims he never went to the house because he didn't know if his mother was home. He wouldn't stop at the Hilltop Store that Mark Hicks told you was some quarter of a mile up the road. He didn't stop there and call anybody and say, I just witnessed a brutal murder. He didn't tell Sheriff Billy McGee that he witnessed a brutal murder. He simply said, A lot of law enforcement for breaking and entering.
>
> He didn't tell Eddie Clark or any of the other law enforcement officers that he witnessed a brutal murder. He waited nine months to come here and tell you. It doesn't fit, Ladies and Gentlemen. It doesn't fit.

Later, the other prosecutor (who had conducted Puckett's cross-examination) added:

> [S]ee, he ran off for two days. He hid in the woods. He was running to his mother's home. His mother told him to shut up and don't say anything, and don't you know that if he had witnessed a murder and it could walk him out the door, that he would have told somebody. He would have told his mother, and they would have told law enforcement, and they would have checked it out at a time when they could have checked it out.

Puckett now argues that the cross-examination and the closing statements violated his rights under *Doyle v. Ohio*, 426 U.S. 610 (1976). *Doyle* held that a defendant's post-arrest silence, after receiving the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966), could not be used for impeachment purposes. *Doyle*, 426 U.S. at 619-20. This issue was raised on direct appeal, and the Mississippi Supreme Court noted that Puckett did not object to this questioning at trial (although the court recognized that his attorney objected in chambers on other grounds), nor did he raise it as an issue in his motion for a new trial. *Puckett v. State*, 737 So. 2d 322, 347 (Miss. 1999). Despite agreeing with the State that the issue was procedurally barred, the court reviewed its merits to determine whether Puckett's fundamental right to remain silent had been violated. *Id*. at 349-50.

37

The court made it clear, however, that it would not consider all of the questions asked during cross-examination, as the initial questions related to the period before Puckett's arrest.  *Id*. at 349.  Thus, it reviewed only the later questions that clearly occurred after he received the *Miranda* warning.  In conducting its review, the court distinguished Puckett's case from *Doyle*, as follows:

> The purpose of *Miranda* is to protect the defendant's Fifth Amendment right against self-incrimination by affording him the right to remain silent.  However, if the defendant does not take advantage of his right to remain silent, any statements he voluntarily makes can and will be used against him in a court of law.  The United States Supreme Court's holding in *Doyle* simply reiterates that the defendant's **silence** cannot be used against him during cross-examination.  However, **because Puckett did not invoke his right** to silence, and made voluntary statements, the *Miranda* and *Doyle* provisions do not apply.  To hold otherwise would not only afford the defendant the right not to incriminate himself by remaining silent but would also afford him the right not to incriminate himself by making voluntary statements which are inconsistent with his testimony at trial.  This would ultimately grant a defendant who chooses to be a witness in his own defense more protection than that granted to any other witness.

*Id*. at 350-51.

The court went on to find that Puckett had made voluntary statements after his arrest that were inconsistent with his trial testimony that David Griffis killed his wife.  "Puckett's statement upon his arrest indicated that he was running from the police after committing a burglary.  However, Puckett's statement at trial indicate [sic] that he was running from the police because he was afraid of Griffis."  *Id*. at 351.  Because the statements were inconsistent, the prosecutor was entitled to impeach Puckett in the manner that he did.

The issue was raised again in Puckett's post-conviction petition, and the court stated that it had earlier "agreed with the State's position that the issue was procedurally barred, not only because the defense did not object to the prosecutor's line of questioning, but also because the issue was not raised in Puckett's Motion for a New Trial."  *Puckett v. State*, 879 So. 2d 920, 935 (Miss. 2004).

The court reiterated that it had "discussed the merits of Puckett's contention to determine if his fundamental rights had been violated." *Id*. Respondents contend that this language, when combined with the court's earlier holding, show that it relied on the lack of a contemporaneous objection to hold that the claim was procedurally barred. They further argue that the court's discussion of the merits of the claim was only an alternative ruling that does not negate the bar.

Puckett argues that the state court opinion did not clearly and expressly rest its ruling on a procedural bar. He further maintains that, even if the Mississippi Supreme Court adequately expressed such a position, the contemporaneous objection rule is not consistently or regularly applied by that court. He finally contends that the decision can nonetheless be reviewed by this Court if it was "interwoven with federal law." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

In general, a state court may make an alternative merits ruling on an issue without waiving its holding that the issue is barred. *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005). However, the procedural bar cannot prevent federal habeas review unless "the last reasoned state-court opinion addressing [the] claim explicitly rejects it on a state procedural ground." *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004); *see Michigan v. Long*, 463 U.S. 1032, 1041 (1983). The reliance on the state procedural bar must be clear and express. *Harris v. Reed*, 489 U.S. 255, 266 (1989); *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997).

The Mississippi Supreme Court's opinions in this case do not clearly and expressly indicate that they are relying on the contemporaneous objection rule to exclude review of this issue. The opinion on direct review explicitly recognized Puckett's contention that his right to remain silent after a *Miranda* warning is fundamental and that the violation of that right is plain error. The court went on to say that, "[I]n light of that contention . . . we will review this line of questioning **both**

39

with regards to the procedural bar . . . **as well as** on the merits." *Puckett*, 737 So. 2d at 349 (Emphasis added). The court agreed that the issue was barred, but continued, "[N]otwithstanding the procedural bar, we recognize that this Court has the authority to review some issues under the plain error rule." *Id*. Quoting from an earlier case that relaxed the contemporaneous objection rule to consider a claim involving fundamental rights, the court concluded, "[A] review of this issue on the merits is appropriate to determine whether Puckett's fundamental rights were violated." *Id*. at 350. In its post-conviction opinion, the court again recognized that the issue was barred, but also admitted that it had discussed the merits in its earlier opinion "to determine if his fundamental rights had been violated." *Puckett*, 879 So. 2d at 935. Neither opinion indicates clearly and expressly that the court relied on the bar in denying relief. For this reason, habeas review is not precluded.

In addressing the merits of Puckett's claim, the state court distinguished his case from *Doyle* by noting that its principles applied only where the defendant remained silent after the *Miranda* warning. *Puckett*, 737 So. 2d at 350. "[I]f the defendant does not take advantage of his right to remain silent, any statements he voluntarily makes can and will be used against him in a court of law." *Id*. Although not cited by the Mississippi Supreme Court, this is the conclusion that the United States Supreme Court reached in *Anderson v. Charles*, 447 U.S. 404 (1980). There, the defendant told police that he stole the victim's car from one location, but gave a different location at trial. *Anderson*, 447 U.S. at 404-05. On cross-examination, the prosecutor asked him about the discrepancy, and this questioning became the basis for the defendant's habeas claim that a *Doyle* violation had occurred. The Court denied relief, holding "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been

induced to remain silent." *Id*. at 408. Applying that rationale to the case before it, the Court held, "The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id*. at 409.

The Fifth Circuit had occasion to consider the rationale of *Anderson v. Charles* in the case of *Pitts v. Anderson*, 122 F.3d 275 (5th Cir. 1997). In *Pitts*, the victim had been shot during an altercation with Pitts, who had come to the victim's property to retrieve his hunting dogs. When Pitts was arrested, he told officers that the victim "come out on me with a gun." At trial, Pitts testified that, after the victim came out of his trailer with a pistol and began shooting at him, Pitts retrieved his own rifle from his truck. The victim then grabbed the rifle, and it went off. On cross-examination, the prosecutor asked Pitts whether he had told the sheriff the second story when he was arrested, and Pitts admitted that he had not. During his closing argument, the prosecutor commented on Pitts's failure to "include the accidental nature of the shooting" in his initial statement. *Pitts*, 122 F.3d at 277-78. In this District Court's opinion on Pitts's habeas petition, United States District Judge Tom S. Lee held that the prosecution had impeached Pitts on his post-*Miranda* statements, rather than his silence, and that, in any event, any error that might have occurred was harmless. *Id*. at 278.

The Fifth Circuit agreed with Judge Lee. According to its analysis, "*Charles* does not mean that anytime a defendant makes a post-*Miranda* statement the prosecution has carte blanche to use the defendant's silence to impeach him." *Id*. at 280. Thus, the court must determine whether the statements at issue "are either intended to or have the necessary effect of raising a negative inference simply because of the defendant's exercise of his right to remain silent . . . ." *Id*. Such statements

are prohibited, but questions or comments designed to elicit an explanation for prior statements that are arguably inconsistent are permitted.

According to the Fifth Circuit, a prosecutor's questioning falls into the prohibited category where the investigative and trial questioning concerns different subjects. "Stated differently, where a defendant's testimony at trial does not deal with the same subject matter as his pre-trial statement, a prosecutor's remarks on omission in the pre-trial statement is considered a plea for the jury to infer guilt or other negative inferences from the defendant's exercise of his Fifth Amendment rights." *Id.* at 281. Where, however, statements made before and during trial concern the same subject matter, "and where the post-arrest statement is sufficiently incomplete as to be 'arguably inconsistent,' . . . . *Charles* applies and comment upon the omissions is permitted." *Id.*

To illustrate this point, the court recited several examples from cases in other circuits where it was held that no *Doyle* violation had occurred. In *Smith v. Cadagin*, 902 F.2d 553 (7th Cir. 1990), the post-arrest statement about an alleged kidnaping at gunpoint was that the situation "got out of hand." At trial, the defendant testified that his actions were meant as a practical joke. In *United States v. Makhlouta*, 790 F.2d 1400 (9th Cir. 1986), the defendant stated post-arrest that he distributed cocaine because he did not expect to be detected. At trial, he claimed to have been entrapped. In *United States v. Butler*, 924 F.2d 1124 (D.C. Cir. 1991), the defendant claimed that he was about to drop off some drugs he obtained from a known dealer. At trial, he testified that he was turning the drugs in to the police for revenge on the dealer. In *United States v. Schultz*, 698 F.2d 365 (8th Cir. 1983), the defendant charged with extortion admitted picking up money left by a bank manager who had been threatened. At trial, he claimed that he was in the area to meet a friend. In *Grieco v. Hall*, 641 F.2d 1029 (1st Cir. 1981), the defendant, who was arrested after running from

a car at the conclusion of a police chase, told officers after his arrest that he was merely a hitchhiker. At trial, he testified that he had been urinating beside the building where the vehicle stopped. In each of the cases discussed above, the court held that there was no *Doyle* violation where the prosecutor inquired into prior statements that were inconsistent with these defendants' trial testimony. Applying the holdings of these cases to Pitts's situation, the court held that Pitts's first story suggested that the shooting was in self-defense, while the second story suggested accident. Because the stories were "arguably inconsistent," the prosecutor could cross-examine Pitts about them. *Id.* at 283.

Two later, unpublished habeas opinions from the Fifth Circuit further illustrate these principles. In *Coulson v. Johnson*, No. 01-20083, 2001 WL 1013186 (5th Cir. Aug. 7, 2001), the defendant, who was accused of killing several family members, made incriminating statements to police immediately after receiving his *Miranda* warnings. At trial, he denied making the statements, and, on cross-examination, he was asked three times whether he denied his involvement in the murders when he was being questioned by police. *Id.* at *14. Recognizing, as it had in *Pitts*, that the fact that the defendant had given a statement after his arrest did not make his silence on any subject admissible, the court applied two alternative tests to determine admissibility. "Pursuant to these tests, a court entertaining a *Doyle* claim must determine (1) 'whether the [prosecutor's] "manifest intent" was to comment on the defendant's silence' or, alternatively (2) 'whether the character of the remark was such that the jury would "naturally and necessarily" construe it as a comment on the defendant's silence.'" *Id.* at 15 (quoting *United States v. Shaw*, 701 F.2d 367, 381 (5th Cir. 1983)).

In *Morrow v. Dretke*, 99 F. App'x 505 (5th Cir. 2004), the defendant, accused of murder, testified at trial that another person committed the murder and told him about it several times before his arrest. During cross-examination, the prosecution asked him whether he had told law enforcement about these confessions when he was arrested. The defendant answered that he had not, stating, "I was advised not to." The court held that the questioning did not violate *Doyle* "because Morrow's prior statements to Ranger Cook involved the same subject matter as, and were arguably inconsistent with, his exculpatory statements at trial that he had known for months that Hampton was guilty of the murder." *Id.* at 516.

In its analysis, the Mississippi Supreme Court reviewed Puckett's post-arrest statement, "[T]his is a lot of law enforcement for somebody who just committed a burglary." It compared that statement with his trial testimony about hiding in the woods because he was afraid of David Griffis after seeing him kill his wife. The court concluded that they were inconsistent. *Puckett*, 737 So. 2d at 351. The court went on to say that, "Puckett's statement upon his arrest indicated that he was running from the police after committing a burglary. However, Puckett's statement at trial indicate[d] that he was running from the police because he was afraid of Griffis." These statements relate to the same subject matter, and the state court's finding that they were inconsistent is neither contrary to, nor an unreasonable application of, federal law.

Fifth Circuit precedent requires that another question be answered – whether the nature of the prosecutor's questioning was intended to, or had the effect of, pointing out those inconsistencies, or whether it was directed toward Puckett's silence. To make that determination, this Court must evaluate the prosecutor's questions in context. *United States v. Laury*, 985 F.2d 1293, 1303 (5th Cir. 1993). As the Mississippi Supreme Court recognized, much of the questioning was directed to

44

Puckett's failure to immediately report the murder he claimed to have witnessed. These questions related to the time period before Puckett's arrest and were, therefore, not post-*Miranda*. A prosecutor may use pre-arrest silence to impeach a defendant because "no governmental action [has] induced [the defendant] to remain silent." *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980); *see also Laury*, 985 F.2d at 1302. In declining to review these statements, the Mississippi Supreme Court's decision was neither contrary to, nor an unreasonable application of, federal law. Later questioning by the prosecutor, however, related to Puckett's failure to tell law enforcement about the murder after he was arrested, and this questioning was properly reviewed by the state court. That court did not make a specific finding regarding the intent or effect of the questioning, focusing instead on its subject matter to find the questioning proper "to show that Puckett's prior statements were inconsistent with his statements at trial." *Puckett*, 737 So. 2d at 351.

A recent Fifth Circuit opinion extensively summarized the law on this issue and concluded that its precedent was unclear. *United States v. Fambro*, 526 F.3d 836, 847 (5th Cir. 2008). It is important to recognize that *Fambro* and most of the cases cited in that court's discussion were direct appeals of federal prosecutions, rather than habeas actions. The appellate court, in that situation, exercises its supervisory powers rather than determines constitutional issues, and its holding may be inapplicable to habeas review. *See Lowenfield v. Phelps*, 484 U.S. 231, 240 n.3 (1988) (noting that the holdings in such decisions need not be followed on habeas review). Nonetheless, the court stated in its discussion, "[O]ur circuit's decisions have turned on a case-by-case, fact-specific analysis, and at times, there seems [sic] to be inconsistencies in our reasoning." *Fambro*, 526 F.3d at 842.

In *Fambro*, the defendant was charged with being a felon in possession of a firearm, which had been found in a dresser in his home. After receiving the *Miranda* warning, Fambro told officers that he and his girlfriend were present when the gun was purchased and that they brought it home in an automobile. At trial, the arresting officer was asked whether Fambro denied knowing of the gun's existence, and the prosecutor told the jury, in closing argument, that Fambro did not deny knowledge or possession of the firearm. *Id*. at 839-40. There was no objection to that argument, so the review was pursuant to Federal Rule of Criminal Procedure 52(b), which permits appellate review of plain error.

In concluding that there was no plain error, the court relied on the *en banc* decision in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978). There, a letter carrier suspected of stealing from the mail was found with a planted silver dollar and two credit cards which were not his. After he was arrested, he gave an explanation for the credit cards, but not the silver dollar. When pressed for an explanation, he said, "You have all the answers, and I don't have any for you." *Id*. at 906. The prosecutor repeated that answer during his closing argument and told the jury, "Mr. Beechum gave no explanation for his possession of the silver dollar." *Id*. The appellate court found no error, "and reasoned that the prosecutor's statement was 'an appraisal of what Beechum said,' rather than a comment on Beechum's silence." *Fambro*, 526 F.3d at 844 (quoting *Beechum*, 582 F.2d at 906).

Based on this reasoning, the *Fambro* court likewise found no error. In so doing, it rejected the rationale of *United States v. Laury*, 985 F.2d 1293 (5th Cir. 1993), and *United States v. Rodriguez*, 260 F.3d 416 (5th Cir. 2001), which held that the test turns on whether the post-arrest and trial statements are inconsistent. *Fambro*, 526 F.3d at 847. Its decision, however, rested in part on the necessity of reviewing the case for plain error under Rule 52(b), which required that the error

46

be "clear under current law." Thus, it held, "We conclude that we are bound by this court's en banc decision in *United States v. Beechum*. . . . To the extent that other decisions of this court might compel a different conclusion, they indicate only that the law in this area is not clear." *Id*.

Using *Beechum* and *Fambro* as guides, it would appear that a prosecutor may question a defendant who gives an incomplete explanation about his culpability after arrest, where he fails to include an exculpatory explanation that is not revealed until trial, so long as the questioning is so directed. Here, Puckett stated when he was arrested that there was a lot of law enforcement present for a burglary. He waited until he testified at trial to explain that he had seen David Griffis murder his wife and had been hiding from him in fear. The prosecutor began by asking why Puckett didn't report the murder immediately after it happened. Then, he cross-examined Puckett about the statement that law enforcement had reported that he had made – that there was a lot of law enforcement for a burglary. Then, he asked why, when he was apprehended and there was substantial police protection from David Griffis, Puckett did not tell his story.

The prosecutor did not stop there, however, but engaged in questioning regarding when, and to whom, exactly, Puckett eventually told the story of the murder. This line of questioning would seem to be more directed toward Puckett's post-arrest silence on this issue. As the Fifth Circuit has taught, however, the questioning must be reviewed in context. In *Coulson*, for example, the court found that, where the prosecutor referenced the inconsistent statements in his questions, his intent was to impeach. Where, however, the questions came "out of the blue," the issue was less clear. 2001 WL 1013186, at *16. Here, the questioning about Puckett's post-arrest statements came in one long sequence, which the prosecutor began by attacking Puckett's testimony on direct that he was

afraid of David Griffis.   Under these circumstances, this Court cannot conclude that a *Doyle* violation occurred.

The closing arguments focus almost entirely on Puckett's failure to report the murder.  Many of the statements were directed to Puckett's pre-arrest behavior, noting that he never went to his mother or to the nearby store to report what he had seen.  Both prosecutors added, however, that Puckett also failed to include this information in what he told the arresting officers.  Had Puckett not said anything when he was arrested, this would be a *Doyle* problem.  *United States v. Rodriguez*, 43 F.3d 117, 122 (5th Cir. 1995).  Given the fact that Puckett made an incomplete statement, reflecting that he had burglarized the home, his failure to include the claim that he witnessed a murder there permitted the prosecutor to impeach his story through questioning or argument.  Thus, there was no *Doyle* violation.

Assuming for the sake of argument that this Court were to find that the prosecutors focused on Puckett's silence on the murder after he had been arrested and before trial, and that the argument was not related to a valid impeachment purpose, then it would have to conclude that a *Doyle* violation occurred.  The Fifth Circuit has summarized the test for determining a prosecutor's intent in such a situation as follows:  "When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous."  *Rodriguez*, 43 F.3d at 121 (citing *Chapman v. United States*, 547 F. 2d 1240 (5th Cir. 1977)).

Even where there is a *Doyle* violation, however, it must still be reviewed for harmless error before habeas relief can be granted.  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *see also Fry*

*v. Pliler*, 551 U.S. 112 (2007) (holding that *Brecht* analysis survives the more recently adopted standard of review in 28 U.S.C. § 2254). In *Brecht*, the Court held that the test on habeas review for determining whether trial error was harmless "is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). There, the defendant was accused of fatally shooting his brother-in-law, then fleeing in his sister's car. After wrecking the car, he told a policeman that his sister was on her way to pick him up. He then hitchhiked to another state. When arrested, he told police that the incident was "a big mistake." At trial, he testified that the shooting was accidental. On cross-examination, the prosecution asked him whether he had told anyone about the shooting prior to trial and argued that the petitioner had ample opportunity to get help for his brother-in-law or to report the shooting to the police officer or his ride. The Court held that the references to his failure to report the crime prior to receiving a *Miranda* warning were permissible, but the references to his failure to tell this story any time prior to trial violated *Doyle*. Apparently, it was not argued that his comment after his arrest was inconsistent with his trial testimony.

Although the court found *Doyle* error in *Brecht*, it concluded that the error was harmless when compared to the other evidence of guilt presented at trial. The references to post-*Miranda* silence were only a few pages of a 900-page trial transcript. Additionally, there were extensive references to the defendant's pre-*Miranda* silence, making the references to his post-*Miranda* silence cumulative. Finally, the evidence of guilt was, in the Court's words, "if not overwhelming, certainly weighty. " *Id*. at 639. Here, the prosecutor's questioning was somewhat more extensive, comprising about eight pages of the 600-page trial transcript of the guilt phase (excluding voir dire). As in *Brecht*, much of that questioning was clearly permissible, relating to Puckett's failure to report the

49

murder prior to the time that he was arrested. There was also substantial evidence of Puckett's guilt, including the testimony of Rhonda's mother, husband, and one of her sons who saw him in the trailer with a club in his hand. The timing of the 911 calls also makes his story improbable. For all of these reasons, even if the prosecution committed *Doyle* error, that error was harmless and cannot be the basis for habeas relief.

**D.      Petitioner's Right to Due Process of Law Was Violated by the Prosecution's Presentation of False Evidence that a Custom Painted Tag Bearing the Phrase "Time Bomb" Was on Display in the Rear Window of Petitioner's Vehicle at the Time of His Arrest.**

Prior to trial, the prosecution moved for a determination of the admissibility of a conversation between Puckett and a previous employer about the movie *The Dark Half*. Apparently, the movie was about a man who had two personalities – one good and one evil. On one occasion, the character beat a man to death with his artificial leg. When acting out the evil side of his personality, that character drove a vehicle with lettering on the back that read, "One High Tone Son of a Bitch." After this discussion, Puckett had a tag made for his truck containing that phrase, although he had been asked by another employer to remove it. The trial judge took the motion under advisement, although he stated he was inclined at that time not to permit the testimony. There was no further discussion on this motion until Michael Riels, an investigator with the Forrest County Sheriff's Office, testified.

Riels found Puckett's truck on the night of the murder, and he testified that there was an airbrushed tag on the back windshield. At that point, defense counsel objected, on grounds that the testimony was going to relate to the movie. The prosecutor assured the court and counsel that he was "not going into the movie." Riels then testified, without objection, that the tag said "Time Bomb"

50

in cursive, with "a bomb with a little fuse on it and like fire lit on the fuse." On cross-examination,

Riels testified that he did not remove the tag from the truck. He also stated that the tag helped him

identify the truck as Puckett's, because he had been told that "Time Bomb" was Puckett's CB

handle. When asked if he was certain there was a tag, and that this was not just something he had

been told, Riels replied, "No, sir; I'm sure it was a tag. I saw the tag, and I knew right then, you

know, that's his CB handle. I pointed at the tag; I say to myself, that's his CB handle there." In his

own testimony, Puckett admitted that his CB handle was "Time Bomb," but denied that he had a tag

on his truck with that name.

This issue was not raised in state court until the post-conviction stage, where Puckett

submitted a *pro se* post-conviction petition that raised it in the form of an ineffective assistance of

counsel claim. The Mississippi Supreme Court held that Puckett's trial counsel addressed the matter

properly by cross-examining Riels and impeaching his testimony through his questioning of Puckett.

*Puckett v. State*, 879 So. 2d 920, 952 (Miss. 2004). Thus, it could find no grounds on which to give

Puckett the relief he sought:

> Puckett makes no suggestion as to what his counsel should have done
> differently other than to object to Officer Riels's testimony. It is clear from the
> record that Mr. Adelman objected at the first hint of any statement regarding the tag
> and its reference to the Stephen King movie, *The Dark Half*. It is also clear from the
> record that Mr. Adelman attempted to impeach Officer Riels's testimony during
> cross-examination. It is not logical that Mr. Adelman would have attempted to
> impeach Officer Riels by means that would have opened the door to evidence of the
> "one high toned son-of-a-bitch" tag, which Puckett had so fervently attempted to
> keep out of court.

*Id*. at 952-53.

Puckett argues that the prosecution knowingly presented false evidence in contravention of

his due process rights, and he offers seven witnesses who would testify to that effect. Respondents

argue that this issue is barred from review because it was not raised in state court as a claim of introduction of perjured testimony, but only as an ineffectiveness of counsel claim. All applicants seeking federal habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-55 (1991); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim. *Williams v. Taylor*, 529 U.S. 420, 429-30 (2000). That presentation must also alert the state court as to the legal basis for the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Thus, the law requires Puckett to present to the state court the "controlling legal principles" that he believes apply to the facts of his case. *Picard v. Connor*, 404 U.S. 270, 277 (1971).

Puckett's claim to this Court is that the prosecutor knowingly presented false evidence to the jury and that the evidence was material to his conviction, in violation of *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959). In his handwritten petition to the state court, Puckett argued:

> The prosecution in this case knew that Officer Riels' testimony was false. Not only that but the prosecution willfully drew it from its witness. This is proved by the fact that the State filed a motion to introduce the evidence of the tag that said, "High Toned Son of a Bitch" into the trial. They were prohibited from doing such so used a blatant bit of chicanery that is known to all to be completely wrong to the common sense of man and the Constitutions of the federal and state constitutions [sic]. See Napue v. Illinois, 360 U.S. 264; Miller v. Pate, 386 U.S. 1; Giglio v. U.S., 405 U.S. 150.

Petition for Post-Conviction Relief, p. 22.

A document filed *pro se* must be liberally construed by the courts and "held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976);

*see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). Given the latitude afforded to a litigant proceeding by way of a *pro se* pleading, this statement was enough to alert the state court that Puckett was making a federal constitutional claim based on the presentation of allegedly perjured testimony by the prosecution. This issue is exhausted and subject to habeas review.

In order to proceed on a substantive claim under *Napue*, however, Puckett must show three things: "(1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material." *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) (citing *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993)). Since the state court decided the issue only by reference to the claim of ineffective assistance of counsel, there are no findings on any of these issues to which this Court must defer. Puckett requested an evidentiary hearing on this issue, but no hearing took place. Therefore, there is no evidence or testimony in the record, other than that mentioned earlier herein, from which this Court can ascertain whether Puckett possessed a tag that said "Time Bomb" on his truck, or whether the prosecutor had any knowledge of the existence or non-existence of such a tag. Although Puckett has offered the names of several witnesses who would testify on his behalf, he has not submitted any affidavits, other than his own, in support of his claim. Furthermore, although he asserts that the witnesses would testify that he had a tag saying, "High Toned Son of a Bitch" and not "Time Bomb," he does not claim to have any witness who would say that the prosecutor knew that Riels's testimony was false. This lack of information makes Puckett's *Napue* claim "unconvincing." *Thompson v. Cain*, 161 F.3d 802, 809 (5th Cir. 1998).

The lack of evidence might not be fatal to Puckett's claim if this Court were inclined to grant an evidentiary hearing, assuming that a hearing would enable Puckett to marshal persuasive evidence

on his claim. However, he still must convince the Court of the third element – that the false evidence was material. "It is axiomatic that not every lie is material." *O'Keefe*, 128 F.3d at 894. Here, although denying that he had an airbrushed tag on his truck that said "Time Bomb," Puckett admitted that his CB handle was "Time Bomb." In fact, he said that one of his friends had given him the name. Based on this testimony, it is difficult to conclude that evidence that he had a tag made to memorialize his CB handle was material to his conviction.

It is true that a lie that might otherwise be immaterial may reach *Napue* proportions if the prosecution capitalizes on it during closing argument. *O'Keefe*, 128 F. 3d at 895. In this case, the closest either prosecutor came to commenting on the testimony during the guilt phase was the following comment:

> When I first got in this case it did concern me because I couldn't quite put my finger – I'm going to tell you about truth. I couldn't quite put my finger on why he did it. And I always try to figure that out in any case I'm in. Why would somebody do what they did? Here was a young man that was an Eagle Scout. Here was a young man who had a lot of people in his community of good people, school teachers that come say what a fine fellow he is, and I just couldn't really figure it out. And then I went to a movie about a month ago. I didn't go; I just saw an ad at a theater, and it was a movie, The Twisters, about people who chased tornados, and it had a byline under it, and it said, The Dark Side of Nature. Twisters, the dark side of nature. And I began to think about it, and I said, you know, a human twister would have – it would be the dark side of human nature, and there's got to be somewhere in the truth of this case a dark side.

This was not a specific reference to any particular evidence or testimony, and is not enough to make Officer Riels's testimony material.

Although Puckett satisfies the exhaustion requirement to bring this claim for habeas review, he has not made out the elements of a *Napue* claim. There is no clear evidence that Riels's testimony was false, other than Puckett's post-conviction affidavit that he had no such tag, which he claims

other witnesses will corroborate. He has not indicated in any way that he has evidence that the

prosecutor knew that Riels's testimony was false. Finally, the testimony was not material. Puckett's

attorney vigorously cross-examined Riels at trial about his testimony, and Puckett told the jury he

had no such tag, although he admitted that "Time Bomb" was his CB handle. In light of the

foregoing, as well as the other evidence of his guilt, Riels's statements were simply not material to

Puckett's conviction, and he is not entitled to habeas relief on this claim.

E.    **Petitioner's Right to a Fair Trial as Guaranteed by the Fourteenth Amendment to the United States Constitution Was Violated at the Guilt-or-Innocence Phase of His Trial by the Admission of Numerous Gruesome Photographs Which Had No Probative Value, and Served Only to Arouse the Passions and Prejudices of the Jury.**

This claim was made on direct appeal and supported by citations to state, not federal, law.

The Mississippi Supreme Court decided the case on that basis, and the Respondents contend that this

issue is barred from review as being unexhausted. In his reply brief, Puckett concedes this point.

Thus, this Court need not address it further.

F.    **Petitioner's Eighth Amendment Right to be Free from Arbitrary and Capricious Imposition of the Death Penalty Was Violated When the Jury Was Permitted to Consider and Weigh a "Heinous, Atrocious or Cruel" Aggravating Circumstance Defined so Broadly by the Trial Court as to Include Virtually All Murders.**

During the sentencing phase of the trial, the jurors were instructed that one of the statutory

aggravating circumstances they could consider in determining a sentence was whether the murder

was "especially heinous, atrocious or cruel." To assist the jury in making that determination, the

court gave the following instruction:

The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious, or cruel, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of, the suffering of others. An especially heinous, atrocious or cruel capital offense is

one accompanied by such additional acts as to set the crime apart from the norm of capital murders, the conscienceless of [sic] pitiless crime which is unnecessarily torturous to the victim.  If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

Puckett argues that this definition failed to perform the narrowing function required by the Eighth Amendment to differentiate those murderers who are eligible for the death penalty.  In particular, he contends that the finding "that the defendant inflicted physical or mental pain before death" could apply to virtually all murders and, therefore, does not provide sufficient guidance to the jury.

The death penalty cannot be imposed through a sentencing procedure that "creates a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (citing *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)).  An aggravator that permits a sentence of death upon a jury's finding that the murder was "outrageously or wantonly vile, horrible and inhuman" is unconstitutional, as it does not adequately restrain "the arbitrary and capricious infliction of the death sentence."  *Godfrey*, 446 U.S. at 428.  Where the jury's discretion is essentially unchanneled by an instruction that lacks the proper standards, the state court may cure the defective instruction by independent review that appropriately narrows the class of persons subject to the death penalty to a constitutionally permissible group.  In *Godfrey*, the Court noted that the Georgia Supreme Court had done that in past cases, affirming the death penalty in situations where the murders were especially torturous or the defendant's state of mind was especially depraved.  In *Godfrey*, however, the two victims were family members involved in a domestic dispute with their killer, they were  killed instantly by gunshots, and the defendant acknowledged his guilt and the heinousness of the crime immediately afterward.  Finding that the

state court's review of this case was at odds with its prior holdings, the Court said, "There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id*. at 433.

Later, in *Maynard v. Cartwright*, 486 U.S. 356 (1988), the Court considered an Oklahoma statute that permitted imposition of the death penalty if the murder was "especially heinous, atrocious, or cruel." In that case, the murderer, a disgruntled ex-employee, broke into the victim's house, shot his wife in the legs, shot and killed the victim, then attacked his wife with a knife. The Court compared the language of the statutory aggravator to the language condemned in *Godfrey*, and it found that it was equally lacking in guidance, stating, "[A]n ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Id*. at 364 (quoting *Godfrey*, 446 U.S. at 429). Finally, the Court held that the facts of the case "did not cure the constitutional infirmity of the aggravating circumstance." *Maynard*, 486 U.S. at 364.

Following *Maynard*, the Mississippi Supreme Court *sua sponte* addressed the constitutionality of the Mississippi statute containing the same language as the Oklahoma statute. *See Clemons v. State*, 535 So. 2d 1354, 1361-64 (Miss. 1988). Despite the similarity in the statutes, the Mississippi Supreme Court held that *Maynard* did not mandate reversal. Instead, it affirmed the conviction on four grounds: (1) the court had consistently applied a limiting construction to the aggravator; (2) there was a mechanism for re-weighing the evidence and imposing the death penalty if an aggravator was invalidated; (3) the murder in question was brutal and torturous; and (4) the trial court gave other instructions to the jury that sufficiently channeled their discretion to impose the death penalty. On appeal, the United States Supreme Court agreed that the state court could independently assess the evidence, but remanded for a clearer decision on how the re-weighing was

conducted.  *Clemons v. Mississippi*, 494 U.S. 738, 751-54 (1990); *see also Lambrix v. Singletary*, 520 U.S. 518, 530-31 (1997) ("We have repeatedly indicated that a sentencing jury's consideration of a vague aggravator can be cured by appellate review.").  A few years later, the Supreme Court invalidated the "heinous, atrocious, or cruel" instruction in another Mississippi case.  *Stringer v. Black*, 503 U.S. 222, 229 (1992).

The Mississippi Supreme Court noted in *Clemons* that it had previously placed a limiting instruction on the "especially heinous, atrocious or cruel" aggravating circumstance.  *Clemons,* 535 So. 2d at 1363-64. In particular, the court cited *Coleman v. State*, 378 So. 2d 640, 648 (Miss. 1979), where it adopted the following standard from the Fifth Circuit:  "What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies – the conscienceless or pitiless crime which is unnecessarily torturous to the victim." (quoting *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir. 1978)); *see also Jordan v. State*, 464 So. 2d 475, 478 (Miss. 1985), *vacated and remanded on other grounds, Jordan v. Mississippi*, 476 U.S. 1101 (1986).

In *Shell v. Mississippi*, 498 U.S. 1, 2-3 (1990), the United States Supreme Court also addressed this instruction, to which had been added a limiting instruction that said, "[T]he word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of, the suffering of others."  Noting that the limiting instruction was nearly identical to one given in *Maynard*, the Court held that it was constitutionally deficient.  *Shell*, 498 U.S. at 2 (Marshall, J., concurring).  Explaining the Court's ruling, Justice Marshall said:

The trial court's definitions of "heinous" and "atrocious" in this case (and in *Maynard*) clearly fail this test; like "heinous" and "atrocious" themselves, the phrases "extremely wicked or shockingly evil" and "outrageously wicked and vile" could be used by "'[a] person of ordinary sensibility [to] fairly characterize almost *every* murder.'"

*Id*. (quoting *Maynard*, 486 U.S. at 363 (quoting *Godfrey*, 446 U.S. at 428-29)).

States using some form of this language in their statutory definition of aggravating circumstances continued to refine it. In *Walton v. Arizona*, 497 U.S. 639 (1990), the Court affirmed a death sentence in a state that permitted the imposition of the death sentence by the trial judge, rather than by a jury.[4] One of the statutory circumstances that could be used as an aggravator was whether the offense was committed in a manner that was "heinous, cruel, or depraved." In affirming the sentence, the Court held that Arizona state courts had sufficiently narrowed that language in their construction of the statute, and it was presumed that the trial judge applied that construction. *Id*. at 653. It then set out the analysis to be performed by a federal court reviewing the application of a statutory aggravating or mitigating circumstance:

> [I]t must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms, and if they have done so, whether those definitions are constitutionally sufficient, *i.e.*, whether they provide *some* guidance to the sentencer. In this case there is no serious argument that Arizona's "especially heinous, cruel or depraved" aggravating factor is not facially vague. But the Arizona Supreme Court has sought to give substance to the operative terms, and we find that its construction meets constitutional requirements.

*Id*. at 654.

---

[4]*Walton* was subsequently overruled by *Ring v. Arizona*, 536 U.S. 584 (2002), but only to the extent that a jury must now find that aggravating factors exist.

In *Maynard*, the Court had suggested that it would approve a definition of the aggravator that would limit it to murders involving torture or physical abuse. 486 U.S. at 364-65. In *Walton*, the Court approved the limiting definition used by the Arizona Supreme Court, which held that a murder was especially cruel when accompanied by mental anguish, including the victim's uncertainty as to his fate or physical abuse. 497 U.S. at 654. It also approved the state court's construction of the term "depraved," which was established when the murderer "relishes the murder, evidencing debasement or perversion" or "shows an indifference to the suffering of the victim and evidences a sense of pleasure in the killing." *Id*. at 655. In a later case, the Court held that, where the validity of the aggravating circumstance had been established, it could not appropriately be attacked by a claim that, as applied specifically to an accused, it was arbitrary or capricious. *Lewis v. Jeffers*, 497 U.S. 764, 778-79 (1990).

The Mississippi Supreme Court considered this issue in its opinion on Puckett's direct appeal. *Puckett*, 737 So. 2d at 359-61. It based its opinion on the following characterization of Puckett's argument – that the first paragraph of the instruction was held unconstitutional in *Shell*, that the language of the first sentence of the second part was held to be constitutional by *Clemons*, but that the language of the last sentence, while not unconstitutionally vague, was "highly prejudicial and legally tenable [sic]." *Puckett*, 737 So. 2d at 359. (This language is taken directly from Puckett's appellate brief, except that he used the word "not" before the phrase "legally tenable.") In affirming the use of the instruction, the state court noted that identical language was approved in its earlier case of *Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

In *Jackson*, the court reviewed the history of appellate review of language attempting to define this aggravator. *Id*. at 1236-37. Specifically, it recognized the deficiency in the instruction

invalidated by *Shell* and the approval of the limiting instruction offered in *Clemons*. With regard to the last sentence of the instruction – the language contested by Puckett – the court noted that it had earlier held:

> [B]arbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or torturous death was suffered by the victim.

*Id*. at 1237.

The court went on to hold that language similar to the last sentence was approved by *Lewis* and *Walton* and thereby mandated affirmance of his sentence. *Puckett*, 737 So. 2d at 361. In his habeas petition, Puckett argues that this decision unreasonably applied *Lewis* and *Walton*, because, in those cases, the Arizona Supreme Court had applied a different standard to uphold a similar instruction. Specifically, he asserts:

> Whereas the Arizona instructions called for findings like uncertainty of fate, relishing, debasement, perversion, indifference to suffering, derivation of pleasure from killing, and gratuitous violence, petitioner's jury was required to find nothing more than pain – mental or physical, mild or acute. Thus, the Mississippi Supreme Court's characterization of the instruction in this case as "similar to" the language upheld in *Walton* and *Lewis* is not only inaccurate, but also objectively unreasonable.

Petition for Writ of Habeas Corpus, p. 56.

The Respondents counter that the vagueness question was affirmatively settled by the recent decision in *Bell v. Cone*, 543 U.S. 447 (2005).[5] In *Cone*, the Court considered a statutory aggravating circumstance permitting the death penalty if the murder "was especially heinous,

---

[5]This was Cone's second trip to the United States Supreme Court; his case had earlier been reversed on different grounds. He has recently been granted certiorari on yet another, unrelated, issue involving a *Brady* violation. *Cone v. Bell*, 128 S. Ct. 2961 (2008).

atrocious, or cruel in that it involved torture or depravity of mind." *Id*. at 448 n.1. A limiting instruction given by the Tennessee court defined "heinous, atrocious or cruel" in the following manner: "'Heinous' means extremely wicked or shockingly evil. 'Atrocious' means outrageously wicked and vile. 'Cruel' means designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others, pitiless." *Id*. at 452 n.4.

In *Cone*, the victims were an elderly couple who had been beaten to death in their home by the petitioner. Blood was spattered throughout the house, and the victims' injuries indicated that they had tried to resist. On direct appeal, the Tennessee Supreme Court had affirmed the finding that the crime was especially heinous, atrocious and cruel after reciting the facts of the case and concluding, "The deaths of the victims were not instantaneous, and obviously one had to be killed before the other. The terror, fright and horror that these elderly helpless citizens must have endured was certainly something that the jury could have taken into account in finding this aggravating circumstance." *State v. Cone*, 665 S.W.2d 87, 95 (Tenn. 1984).

Cone petitioned for habeas relief, which was ultimately granted by the Sixth Circuit. *Cone v. Bell*, 359 F.3d 785 (6th Cir. 2004). After reviewing the Supreme Court precedent discussed above, that court concluded that, while no case considered exactly the same language used in the Tennessee statute, similar instructions had been held to be unconstitutionally vague. It then considered whether the Tennessee Supreme Court had "saved" the instruction by applying a narrowing construction to it. *Id*. at 796-97. In an earlier case, the Tennessee court had applied language approved by the Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 255-56 (1976), to hold that the aggravator was "directed at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *State v. Dicks*, 615 S.W.2d 126, 132 (1981) (quoting *State v. Dixon*, 283

So. 2d 1, 9 (Fla. 1973)). The Sixth Circuit recognized that the state court had explicitly reviewed the facts supporting the finding of that aggravator, but it had not specifically applied, or even mentioned, the *Dicks* decision. Thus, it held, no narrowing interpretation was applied to the unconstitutional instruction, and the state court's decision was therefore an unreasonable application of federal law. *Cone*, 359 F.3d at 797.

The Supreme Court reversed, holding, "Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation." *Cone*, 543 U.S. at 455 (citing *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002)). Finding no express refusal to apply its limiting construction, particularly where the Tennessee court had earlier recognized that it was constitutionally compelled and regularly applied it, the Supreme Court presumed that the Tennessee court had applied it to Cone's case. The Court also reviewed the facts in the state court opinion and found them to be similar to facts recited in cases where the limiting construction had been expressly applied. *Id.* at 456. Reviewing the limiting construction applied by *Dicks* and other cases from the Tennessee Supreme Court, the Supreme Court held that, even if the statutory aggravating circumstance was facially vague, "[W]e are satisfied that the State's aggravating circumstance, as construed by the Tennessee Supreme Court, ensured that there was a 'principled basis' for distinguishing between those cases in which the death penalty was assessed and those cases in which it was not." *Cone*, 543 U.S. at 459 (citing *Arave v. Creech*, 507 U.S. 463, 474 (1993)).

In attacking this argument, Puckett distinguishes his case from *Cone*:

Petitioner's argument is not that the Mississippi Supreme Court failed to apply a previously settled-upon narrowing construction, nor is it that there was anything wrong with the portion of the HAC instruction given in this case that drew directly

from *Proffitt*. Rather, petitioner's contention is that by elaborating on the standard approved in *Proffitt* so as to authorize a HAC finding on nothing more than a determination that the "defendant inflicted physical or mental pain before death," the trial court nullified the narrowing effect of the otherwise constitutionally permissible *Proffitt* language, and in so doing restored the unconstitutional overbreadth that the *Proffitt* language was intended to cure.

Petitioner's Reply Brief, p. 39.

Puckett also disputes Respondents' claim that this issue has been resolved in this Court by Judge Lee's unpublished opinion in *Williams v. Puckett*, No. 1:97cv320LN.[6] In *Williams*, Judge Lee considered an instruction virtually identical to the one given in this case and found it constitutional. Specifically, he held that the Supreme Court had approved the language of the instruction, or substantially similar language, in *Clemons* and *Maynard*. Puckett argues that the instructions were dissimilar, providing the following illustration:

| **HAC charge given in Puckett's case** | **HAC charge given in *Williams*** |
|---|---|
| An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders, the conscienceless of [sic] pitiless crime which is unnecessarily torturous to the victim. **If you find from the evidence beyond a reasonable doubt that** the defendant utilized a method of killing which caused serious mutilation, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, **then you may find this aggravating circumstance**. Tr. 1214-1215 (emphasis added) | An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders – the conscienceless or pitiless crime which [is] unnecessarily torturous to the victim. **This can be shown by** the fact that the Defendant utilized a method of killing which caused serious mutilation, where the Defendant inflicted physical or mental pain before death, or where there was mental torture and aggravation before death or where a lingering or torturous death was suffered by the victim. *Williams*, slip op. at 29-30 (emphasis added) |

---

[6]The "Puckett" in this decision is the former Commissioner of the Mississippi Department of Corrections, not the present Petitioner.

Puckett argues that the difference in the language between the two charges sufficiently differentiates his case from *Williams* so that Judge Lee's holding should not apply here. Specifically, he argues that the phrase "This can be shown by" in the *Williams* instruction refers to the preceding phrase "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," making the phrases that follow merely examples of such crimes. In contrast, he contends that the instruction in his case, by beginning the last sentence with, "If you find from the evidence beyond a reasonable doubt," converts that sentence into "a second, stand-alone definition of 'heinous, atrocious or cruel.'" Reply brief, p. 40. The distinction is subtle, and this argument is not persuasive.

In Puckett's case, the Mississippi Supreme Court held that the language of this instruction offered an appropriately limiting definition of the aggravator, consonant with the language approved in *Clemons*, *Lewis*, and *Walton*. *Puckett*, 737 So. 2d at 360-61. This Court cannot grant habeas relief unless it finds that the state court unreasonably applied that precedent to the case at hand. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Furthermore, the application must be objectively unreasonable, not merely erroneous or incorrect. *Id*. at 411. In *Middleton v. McNeil*, 541 U.S. 433 (2004), the Supreme Court addressed a situation where a phrase was inadvertently added to an instruction on self defense. The accused argued that the phrase effectively eliminated her defense, negating other parts of the instruction that correctly stated the law. The state appellate court disagreed, noting that the instruction had to be considered in the context of the instructions as a whole. On habeas review, the Supreme Court also rejected the argument. "This interpretation would require such a rare combination of extremely refined lawyerly parsing of an instruction, and extremely gullible acceptance of a result that makes no conceivable sense, that the state court's

implicit rejection of the possibility was surely not an unreasonable application of federal law." *Id*. at 438. Although the Supreme Court has not considered the exact language of Puckett's instruction, its clearly established precedent has generally held that states may present additional language to the jury that defines the heinous, atrocious or cruel aggravating circumstance. The Mississippi Supreme Court's repeated approval of the language of this instruction cannot be said to be an unreasonable application of that law.

Moreover, even if this instruction were facially overbroad, it could be saved by appropriate appellate review by the state court. *Cone*, 543 U.S. at 456; *Proffitt v. Florida*, 428 U.S. 242, 255 (1976). The Mississippi Supreme Court routinely reviews this aggravating circumstance to determine whether the facts of each case fit within its guidelines for determining whether the crime was heinous, atrocious or cruel. For example, in *Davis v. State*, 684 So. 2d 643 (Miss. 1996), the jury found this aggravating circumstance after being instructed using the same language employed at Puckett's trial. After reviewing the instruction "as a whole" and determining that it was adequate, the court turned to the facts of the case. Recounting the evidence, the court concluded, "The number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged, provided support for the jury's findings that the murder was unnecessarily torturous to [the victim]." *Id*. at 662. In another case, the Mississippi Supreme Court found that a murder committed "execution style" after a kidnaping exhibited the qualities of callousness and cruelty that justified a finding that it was heinous, atrocious and cruel. *Jordan v. State*, 912 So. 2d 800, 818-19 (Miss. 2005). Similarly, a murder committed after a kidnaping, sexual assault and a rape also exhibited those qualities and justified the same finding. *Woodward v. State*, 726 So. 2d 524, 538-39 (Miss. 1997).

The seriousness with which the court conducts that review was evidenced by its declaration that the aggravator was improperly found in a case where the victim was strangled, where there was "no evidence of any 'additional acts' to set the crime apart from the norm of capital felonies as conscienceless, pitiless or unnecessarily torturous." *Taylor v. State*, 672 So. 2d 1246, 1276 (Miss. 1996). On the other hand, where the evidence showed that the victim struggled with her attacker, suffering numerous injuries before she was strangled and stuffed into the trunk of her car, the court has found that the aggravator was properly employed. *Knox v. State*, 805 So. 2d 527, 533-34 (Miss. 2002).

The court has also reviewed the language of the instruction itself, to determine whether it is constitutional on its face. In *Pinkney v. State*, 538 So. 2d 329, 357 (Miss. 1988), the Mississippi Supreme Court noted that it had "in several instances placed a limiting construction on 'especially heinous, atrocious or cruel.'"[7] It cited three earlier cases in which it did so, including one where that court held that the jury "could consider 'mental torture and aggravation' which the victim probably underwent" to make the determination. *Id*. (citing *Evans v. State*, 422 So. 2d 737, 743 (Miss. 1982)). The court then added the language that apparently became the basis of the instruction used in Puckett's case:

> We note also that barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which

---

[7]The limiting instruction was not used at Pinkney's trial, but the Mississippi Supreme Court left his death sentence undisturbed, on grounds that another, valid aggravator would support it. The United States Supreme Court reversed and remanded, on the basis of its opinion in *Clemons*. *Pinkney v. Mississippi*, 494 U.S. 1075 (1990). On remand, the Mississippi Supreme Court refused to re-weigh the aggravating and mitigating circumstances and remanded the case back to the trial court. *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992). Pinkney, who had also beaten a woman to death with a maul in the course of a burglary, pleaded guilty to simple murder and burglary and received a sentence of life plus fifteen years. *Pinkney v. State*, 757 So. 2d 297 (Miss. 2000).

caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or torturous death was suffered by the victim.

*Pinkney*, 538 So. 2d at 357.

Obviously, this language is closer to the *Williams* instruction, in that it states that the aggravator "can be demonstrated" by the situations that follow. That language was converted into an instruction telling the jury that "if it finds" that any of those situations exists, it "may" find that the murder was heinous, atrocious or cruel. The Mississippi Supreme Court has reviewed the revised instruction on numerous occasions, and it has never suggested that a bare finding of physical or mental pain would mandate a finding of that aggravating circumstance. Instead, the cases indicate that the state court considers the last sentence of that instruction as further refining and limiting the imposition of the death penalty to cases where there was "mental torture" or "barbarity."

The state court's intention was made clear in *Jenkins v. State*, 607 So. 2d 1171, 1181-82 (Miss. 1992), where the court re-affirmed its intention that the aggravating circumstance be applied to only a limited class of murders. There, the court analyzed the instruction in the three segments argued by Puckett and found it to be proper. In specifically addressing the last sentence, the court noted that it was taken from *Pinkney*, where the court "expressed the desire to see that 'our capital sentencing juries . . . be more specifically instructed on the meaning of 'especially heinous, atrocious or cruel.'" *Id*. at 1181 (quoting *Pinkney*, 538 So. 2d at 357). In *Conner v. State*, 632 So. 2d 1239, 1270-71(Miss. 1993), *overruled on other grounds by Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999), the court analyzed the instruction given in the *Williams* form and held that, while the first sentence standing alone was unconstitutionally vague, "The second and third sentences, however, provide additional specificity and detail sufficient to meet the demands of the Eighth and Fourteenth

68

Amendments to the United States Constitution." *Id.* at 1271; *see also Watts v. State*, 733 So. 2d 214, 238-39 (Miss. 1999).

Puckett's argument relies on a subtle construction of the heinous, atrocious and cruel instruction. Even if this Court agreed with Puckett's interpretation, it could not find that the state court's construction unreasonably applied clearly established federal law. Moreover, the instruction in question has been reviewed numerous times in state court, and a review of those cases shows that the Mississippi Supreme Court has applied a limiting construction of it that appropriately narrows the class of persons eligible for the death penalty under this aggravator. For these reasons, Judge Lee's conclusion in *Williams* that this instruction offers no basis for habeas relief is appropriate to follow here.

**G.  Petitioner's Rights to Due Process of Law and to Be Free from Arbitrary and Capricious Imposition of the Death Penalty, as Guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution, Were Violated When He Was Sentenced to Death Based, in Part, on the "Avoiding or Preventing a Lawful Arrest" Aggravating Circumstance.**

Puckett's argument on this issue is two-fold: first, he attacks the sufficiency of the evidence used to support the finding of this aggravating circumstance, and, second, he asserts that the aggravating circumstance itself is unconstitutionally overbroad.[8]  Respondents counter that the second claim, insofar as it rests on federal law, is barred from review as not having been raised in state court. Puckett responds that the claim was raised and implicitly recognized in the Mississippi Supreme Court's post-conviction decision.

---

[8]The aggravating circumstance is codified at Miss. Code Ann. § 99-19-101(5)(e), which states, "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."

Puckett's trial counsel objected to the instruction with no argument. The prosecutor recited the facts of the case that he believed supported the instruction, and the court overruled the objection. On appeal, Puckett argued that the evidence did not support the instruction, noting that the prosecution's case rested on the theory that Puckett murdered Rhonda Griffis while acting out a sexual fantasy. No federal case law or constitutional provision was mentioned in the briefs submitted in Puckett's direct appeal. The Mississippi Supreme Court's affirmance on this issue did not reference federal law, as its decision was based solely on the quantum of evidence that could have supported this aggravator:

> First, Puckett testified that after the idea of breaking into the Griffis' trailer 'popped' into his mind, he drove by the trailer several times to see if anybody was at home. Second, Puckett parked his truck in a vacant lot beside the trailer. Third, Puckett put on a pair of coveralls and grabbed a pair of gloves from his truck. Fourth, Puckett also stated he picked the trailer because it was off by itself. Fifth, when he was seen by Rhonda's mother, he immediately came toward her with the club raised and told her to be quiet.
>
> . . . .
>
> It was determined at trial that Rhonda and her family knew Puckett prior to the murder. Puckett testified that he saw Rhonda's car in the driveway before he went to the door of the trailer. Whether Puckett went to the trailer to steal money or to carry out his sexual fantasies, the fact that Puckett took extra steps not to be detected and the fact that he knew Rhonda could identify him, provided some credible evidence upon which the jury could find that Puckett killed Rhonda in an effort to avoid apprehension. Additionally, the fact that Puckett came towards Rhonda's mother with the stick raised also provides sufficient evidence upon which the jury could infer that had he not been interrupted by David Griffis, Puckett also intended to kill Nancy Hatten in order to avoid detection. Accordingly, the trial court's granting of this instruction was not reversible error.

*Puckett v. State*, 737 So. 2d at 361-62.

In his petition for post-conviction relief,[9] Puckett raised an Eighth Amendment objection to the instruction, arguing that the Constitution was violated by presenting this aggravating circumstance to the jury on the facts of his case. This was one sentence in a five-page argument that was otherwise focused on state law. The Mississippi Supreme Court refused to reconsider this issue, noting that it had been "fully addressed on direct appeal." *Puckett v. State*, 879 So. 2d 920, 947 (Miss. 2004). The court re-stated its earlier finding "that there was credible evidence upon which the jury could find that Puckett murdered Rhonda in an effort to avoid apprehension, and, accordingly, the trial court did not err in allowing it to be considered by the jury." *Id*. Finding the claim to be barred from further consideration by the doctrine of *res judicata*, the court held Puckett was entitled to no relief. *Id*.

Puckett argues that the state court ruling is, in effect, a ruling on the merits of his federal constitutional claim, making it exhausted and amenable to habeas review by this Court. All applicants seeking federal habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief. *See Edwards v. Carpenter*, 529 U.S. 446, 451-54 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-55 (1991); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim. *Williams v. Taylor*, 529 U.S.420, 429-30 (2000). That presentation must also alert the state court as to the legal basis for the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

---

[9]This was the petition filed by his post-conviction counsel, not the hand-written petition that Puckett submitted, *pro se*, which this Court liberally construed in Section 3 of this Opinion to have raised a federal claim.

The law required Puckett to present to the state court the "controlling legal principles" that he believes apply to the facts of his case. *Picard v. Connor*, 404 U.S. 270, 277 (1971). Here, the controlling legal principles presented to the state court discussed the evidentiary requirements to support a claim that the murder was committed to avoid or prevent detection and lawful arrest. In a case somewhat similar to Puckett's, the Fifth Circuit dismissed a habeas claim raising the exclusion of an exculpatory statement at trial. *Wilder v. Cockrell*, 274 F.3d 255, 259-60 (5th Cir. 2001). Wilder's state court arguments were predicated on state evidentiary rules, only mentioning the Fifth and Fourteenth Amendments. In his post-conviction proceedings, he made a brief reference to the case of *Chambers v. Mississippi*, 410 U.S. 284 (1973). After he filed his habeas petition, the district court, apparently *sua sponte*, applied *Chambers* to hold that the exculpatory statement should have been admitted. The Fifth Circuit reversed, holding that the *Chambers* claim had not been exhausted in state court:

> A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights. Moreover, to hold that vague references to such expansive concepts as due process and fair trial fairly present, and therefore exhaust, federal claims is to eviscerate the exhaustion requirement.

*Wilder*, 274 F.3d at 260; *see also Castillo v. McFadden*, 399 F.3d 993, 1003 (9th Cir. 2005) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory.").

Here, Puckett's reference to the Eighth Amendment was brief and not sufficient to have alerted the Mississippi Supreme Court to any federal constitutional basis for his claim. Construing the Mississippi Supreme Court's refusal to review his post-conviction argument as an implied substantive ruling on this issue simply assumes too much and cannot be the basis for finding that the

claim was exhausted in state court.  Additionally, in *Wilder*, the Fifth Circuit noted that the claims presented in state court were legally, logically and mechanically distinct from those presented for habeas review.  *Wilder*, 274 F.3d at 261-62.  In his post-conviction petition, Puckett cited the Eighth Amendment as a basis for precluding use of the aggravator where there was insufficient evidence to support it.  Here, he argues that the Eighth Amendment supports his contention that the statutory aggravator is unconstitutionally overbroad as it is written and construed by the state courts.  This is a separate claim, and it was never presented to the state court for review.  Therefore, Puckett's claim is barred from habeas review to the extent that it attacks the aggravating circumstance generally.

Even if it were not, however, Mississippi's construction of this aggravating circumstance has kept it within constitutional boundaries.  *Gray v. Lucas*, 677 F.2d 1086, 1110 (5th Cir. 1982); *Evans v. Thigpen*, 631 F. Supp. 274, 283 (S.D. Miss. 1986); *Wiley v. Epps*, 2007 WL 405041 (N.D. Miss. Feb. 2, 2007).  That being the case, Puckett's argument is reduced to a claim that the evidence was insufficient to satisfy the jury's finding on this aggravator.  "Our review of these findings [on aggravating circumstances] is limited to the question whether they are so unprincipled or arbitrary as to somehow violate the United States Constitution."  *Barclay v. Florida*, 463 U.S. 939, 947 (1983).  Generally, the federal court's role in reviewing a state court's finding of an aggravating circumstance is primarily a review of whether the aggravator itself is constitutionally defined.  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  That review is foreclosed in this case by Puckett's failure to exhaust this claim in state court.

Beyond the aggravator's definition and construction, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation."  *Id*.  That review is conducted under the

familiar rationale of *Jackson v. Virginia*, 443 U.S. 307 (1979). The relevant question is, "[W]hether, after viewing the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 324. As the United States Supreme Court has explained, however, "Federal Courts are not forums in which to relitigate state trials." *Autry v. Estelle*, 464 U.S. 1, 3 (1983).

Mississippi has construed this aggravating circumstance "to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony." *Gray*, 677 F.2d at 1109-10. The evidence must be sufficient for the jury to "reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing." *Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991) (citing *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983)). The evidence relied on by the Mississippi Supreme Court was quoted earlier; however, Puckett attempts to cast doubt upon its validity because he contends that the prosecutor argued a different motivation for the crime in closing argument.

In particular, Puckett quotes from the argument made by one of the prosecutors during the guilt phase, in which he explained to the jury his opinion of why Puckett committed the murder. According to this prosecutor, Puckett went to the trailer to act out his sexual fantasy, and, when Rhonda did not agree to take part in it, he went into a blind rage. Puckett maintains that this theory of the crime is at odds with the charge that he murdered Rhonda to avoid arrest, thereby negating the evidence described by the Mississippi Supreme Court to support the aggravator. Later in that argument, however, the same prosecutor said, "She's not here, and she's not here [sic], and he knew when he went in that apartment and he took this club – he knew she knew him. He knew that. And

that's the most dangerous thing to worry about if you ever run into somebody with evil on their mind, if they know you, they're going to kill you. There's going to be no witnesses."

At the conclusion of the sentencing phase, after the jury had been instructed on the aggravating circumstances, the other prosecutor argued first, summing up the evidence supporting the charge that Puckett killed Rhonda Griffis to escape arrest:

> The second [aggravator]: The capital offense was committed for the purpose of avoiding or preventing the lawful arrest or effecting an escape from custody. Why did he do that? Why did he take this club and, as one of the doctors testified, shattered her skull like an egg or a crystal until her brain was hanging out? You know why? Because he knew her; he knew her. She could identify him; that is why he killed her. He did not know Nancy Hatten was coming up there; he would have killed her too. He would have been happy to; he was coming at her, backing her into the kitchen with this when David and the boys came home. That is the only thing that prevented that.

This argument is consistent with the evidence summarized by the Mississippi Supreme Court's opinion on direct appeal to support the finding of this aggravating circumstance. It is consistent with the evidence that was offered at trial. It is also consistent with fact patterns in other cases in which the Mississippi Supreme Court has affirmed the existence of this aggravator. For example:

> First, King admitted to burglarizing Patterson's home. Further, King admitted that he knew Patterson. In his statement, he admitted that he chose Saturday to break into her house because he knew she went over to her daughter's house sometimes. He stated that after entering Patterson's home, he checked to see where she was and saw her in the front bedroom. He admitted that he knew that she was hard of hearing because she told him so before. He further stated that he knew she always wore glasses but did not know her sight was bad. Therefore, it is reasonable that the jury inferred from the fact that Patterson could identify King, he needed to conceal his identity as the burglar of her home. The jury could have inferred that King killed Patterson to avoid detection based on the fact that he chose the day to break in her home based on a time when he thought she might not be there.

*King v. State*, 960 So. 2d 413, 445 (Miss. 2007). Also:

Hodges burglarized the home with the intent to commit an assault. Cora testified that Hodges informed her that the reason he went to her house that night was to kill her and her mother if she had been there. Before arriving at Cora's house, Hodges went home and changed into black clothes, black gloves and a beige ski mask. Hodges did not park in the driveway to the house but parked two houses down. The jury could have easily concluded that Hodges disguised himself in order to conceal his identity and when Isaac still recognized him, Hodges shot him in order to avoid apprehension and eventual arrest. Since efforts to avoid arrest after the murder may also be considered, there is ample evidence of Hodges's continued attempts to avoid arrest. . . . this Court has held that efforts to dispose of and/or conceal the evidence of the crime are sufficient to support the avoiding arrest instruction.

*Hodges v. State*, 912 So. 2d 730, 786 (Miss. 2005) (citing *Wiley v. State*, 750 So. 2d 1193, 1206 (Miss. 1999)).

Other cases have found the existence of this aggravator on far fewer facts. *See, e.g., Ross v. State*, 954 So. 2d 968, 1010 (Miss. 2007) ("Because Ross knew Yancey personally, it was reasonable for a jury to conclude that Yancey was murdered to conceal either the identity of the killer or to avoid investigation for the robbery."); *Thorson v. State*, 895 So. 2d 85, 99 (Miss. 2004) (holding that aggravator existed where, after raping his victim, the defendant wiped down the car, asked the victim whether she would tell anyone what happened, decided that he did not believe her and killed her); *Chase v. State*, 645 So. 2d 829, 857 (Miss. 1994) (holding that aggravator existed where defendant used gloves, parked his vehicle in a wooded area about 200 yards from the victim's home, refused to get out of his car at a service station because he had blood on his clothes, and later threw his clothes away).

Here, Puckett was seen on the day of the murder near the place where David Griffis and his children were gathering pine straw. The jury could have inferred from that testimony that Puckett was checking on Griffis's whereabouts before going to his home. He admitted at trial that he originally planned to enter Griffis's trailer to burglarize it to get money for his truck payment.

Toward that end, he drove past the home a few times to see if anyone was home. Since it appeared that no one was there, he parked his truck in a vacant lot next to the trailer, grabbed a pair of gloves from his truck, stepped up to the porch and knocked on the door. When no one answered, he looked through a window and knocked again. After the second knock, Rhonda let him in, and, instead of the planned burglary, Puckett allegedly acted out a sexual fantasy.

There was ample evidence that the entire Griffis family knew Puckett, since, when he worked for Griffis, Puckett reported to the trailer every morning to go to work. After Rhonda was killed, Puckett advanced toward her mother with the same club. He escaped from David Griffis and ran into the woods for two days, where he stayed until he was spotted from a helicopter. When David saw Puckett in his trailer, he was wearing green coveralls with a zipper. When Puckett was captured, he was wearing different coveralls. Those coveralls were tested and found to have no human blood on them.

From this evidence, the jury could have inferred sufficient facts to uphold this aggravating circumstance. They could have concluded that Puckett planned to enter the Griffis home covertly, in order to burglarize it or to commit a sexual assault. Once inside, he committed an assault on Rhonda, who was found nude from the waist down. He then beat her to death to avoid being identified. The jury could have concluded that Puckett would have killed Nancy Hatten in a similar manner, had he not been interrupted by David Griffis. After escaping from Griffis, Puckett hid in the woods for two days. During that time, he changed out of and discarded his bloodstained clothing. Puckett only turned himself in after being seen from a helicopter.

Based on these facts, any rational trier of fact could have found, beyond a reasonable doubt, that Puckett murdered Rhonda Griffis for the purpose of avoiding arrest. The Mississippi Supreme

Court's affirmance of the use of this aggravator is consonant with its prior cases and is not an unreasonable application of, or contrary to, federal law. Puckett's Eighth Amendment challenge to the language of the aggravator, itself, is procedurally barred from federal habeas review. Even if it were not, however, the statutory aggravator has been found constitutionally valid. For all of these reasons, Puckett cannot prevail on this claim.

**H.** **Petitioner's Rights to an Individualized Determination of His Sentence and to Be Free from Arbitrary or Capricious Imposition of the Death Penalty as Guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution Were Violated When the Jury Was Permitted to Return a Death Sentence without First Finding that Aggravating Circumstances Outweighed Mitigating Circumstances.**

Puckett argues that the instructions given in his case, which mirrored the relevant statutory language, instructed his jury that they could impose the death penalty if the mitigating circumstances that they found did not outweigh the aggravating circumstances. According to him, this prevented the jury from returning a life sentence if they found that the aggravating and mitigating circumstances were in equipoise. Such a result, Puckett asserts, is prohibited by the Eighth Amendment.

Respondents counter Puckett's argument by stating that this claim is procedurally barred, as never having been raised in state court. Puckett admits that the claim was not asserted earlier, but argues that the futility exception excused exhaustion. Where a petitioner has failed to exhaust all of the claims in his federal habeas corpus petition, the federal court generally must dismiss it, so that the petitioner can return to the state court to exhaust those claims. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Under the "futility exception" to the exhaustion requirement, if state procedural rules bar the petitioner from seeking further relief on his unexhausted claims in state court, the exhaustion

requirement is satisfied. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). That exception is codified at 28 U.S.C. § 2254(b)(1)(B), excusing failure to exhaust when it appears that:

(I)       there is an absence of available State corrective process; or

(ii)      circumstances exist that render such process ineffective to protect the rights of the applicant.

*Id*.

Generally, when a petitioner allows his state law remedies to lapse without presenting his claims in state court, the fact that it would be "futile" to assert them in state court will not excuse the procedural default. *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998).

Puckett asserts that he should be excused from exhausting his equipoise claim because the Mississippi Supreme Court had recently decided a case in a manner adverse to his position, thereby making it futile to have raised this claim in state court. He cites *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999), for that proposition. In *Fisher*, the court held that the futility exception applied where "the highest state court has recently decided the same legal question adversely to the petitioner." *Id*. In taking this position, the Fifth Circuit joined a minority of the Circuits in recognizing this situation as excusing failure to exhaust. *Contra, Price v. Simmons*, 196 F. App'x 696, 697 (10th Cir. 2006); *Parker v. Kelchner*, 429 F.3d 58, 63 (3d Cir. 2005); *Jones v. Keane*, 329 F.3d 290, 295 (2d Cir. 2003); *Minter v. Beck*, 230 F.3d 663, 666 (4th Cir. 2000); *Scott v. Mitchell*, 209 F.3d 854, 872 (6th Cir. 2000); *Waldrup v. Jones*, 77 F.3d 1308, 1315 (11th Cir. 1996); *White v. Peters*, 990 F.2d 338, 342 (7th Cir. 1993); *Roberts v. Arave*, 847 F.2d 528, 529 (9th Cir. 1988).

The court in *Fisher* applied this principle to a case involving a question of law, in the sense that it involved the application of a specific law to similarly situated litigants. There, the question

was whether religion-based peremptory strikes violated the Equal Protection Clause. *Fisher*, 169 F.3d at 303. Application of the futility doctrine to cases involving legal claims makes it easier to satisfy the requirement that the adverse decision on which a petitioner relies must have been rendered after "a full and fair opportunity to decide the *same* issue in a *recent* case . . . ." *Lewis v. Cockrell*, 2003 WL 261847 at *4 (5th Cir. 2003) (ex post facto claim); *Fisher*, 169 F.3d at 303; *Youngblood v. Lynaugh*, 882 F.2d 956, 960 (5th Cir. 1989), *rev'd on other grounds sub nom, Collins v. Youngblood*, 497 U.S. 37 (1990) (ex post facto claim); *Layton v. Carson*, 479 F.2d 1275, 1276 (5th Cir. 1973) (substitution of imprisonment for fines for indigent prisoners). In contrast, the Fifth Circuit has rejected the futility argument for a fact-based claim. *Beazley v. Johnson*, 242 F.3d 248, 269 (5th Cir. 2001). There, the petitioner had failed to exhaust his claim that a Texas county had engaged in a longstanding pattern of discrimination in the selection of grand jury forepersons. When he attempted to argue that the claim had been exhausted by its rejection in state court in other cases, the Fifth Circuit characterized his argument as a "vicarious exhaustion proposition." *Id*. In *Bruce v. Cockrell*, 74 F. App'x 326, 337 (5th Cir. 2003), the court rejected an assertion that futility excused the failure to exhaust a claim that instructions given at trial did not permit the jury to give full effect to the evidence of mitigating circumstances.

Puckett contends that the Mississippi Supreme Court's decision in *Smith v. State*, 729 So. 2d 1191, 1225 (Miss. 1998), "rejected a challenge materially identical to" Puckett's claim here. Petition for Writ of Habeas Corpus, p. 46. *Smith* was decided about six months before the court issued its opinion on Puckett's direct appeal, but after Puckett had submitted his appellate brief. It is questionable, therefore, whether this opinion could have satisfied the futility doctrine. However, within the body of the *Smith* opinion, the Mississippi Supreme Court noted that "identical arguments

have been consistently rejected by this Court." *Id*. at 1226. Following that sentence was a citation to cases decided prior to Puckett's trial; therefore, it is conceivable that counsel declined to raise this issue on the basis of what appeared to be settled law on this question. As the challenge to this instruction is based on a legal claim, rather than a claim based on particular facts, the futility doctrine would apply.

That being said, however, Puckett still cannot obtain habeas relief on this claim. As he noted in his reply brief, the United States Supreme Court had granted certiorari on this question in the case of *Kansas v. Marsh*, 544 U.S. 1060 (2005). After briefing on this case had concluded in this Court, the Supreme Court rendered its opinion, which is unfavorable to Puckett's position. In that case, the Court considered a Kansas statute that contained the following language:

> If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 . . . exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death, otherwise the defendant shall be sentenced as provided by law.

*Kansas v. Marsh*, 548 U.S. 163, 171 (2006); Kan Stat. Ann. § 21-4624(e) (1995).

The Kansas Supreme Court had reversed the death penalty imposed in that case, holding that the statute unconstitutionally permitted the sentence where the aggravating and mitigating circumstances were in equipoise. The Supreme Court reversed the state court, relying on its earlier decision in *Walton v. Arizona*, 497 U.S. 639 (1990).

In *Walton*, the Court reviewed a sentencing statute that permitted the imposition of the death penalty where an aggravating circumstance had been found and it was determined "that there are no mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat. Ann. § 13-703 (1989); *see Walton*, 497 U.S. at 644. *Walton* specifically rejected the contention that the Arizona

statute unconstitutionally shifted the burden to the defendant to establish mitigating circumstances sufficient to avoid the death penalty. "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 650.

Following *Walton*, the Court held that sentencing instructions were not constitutionally flawed because they did not give the sentencing jury any specific guidance on weighing aggravating circumstances against mitigating factors. *Tuilaepa v. California*, 512 U.S. 967, 979 (1994). The Court held such guidance unnecessary since, once the jury finds that the defendant fits within the category of death-eligible offenders defined by the state's legislature, it is "free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.; California v. Ramos*, 463 U.S. 992, 1008 (1983). In fact, the jury may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Tuilaepa*, 512 U.S. at 979 (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).

In *Marsh*, the Court held that the Kansas statute functioned in substantially the same manner as the Arizona statute discussed earlier, such that *Walton* controlled. According to the Supreme Court, its "mitigation jurisprudence" extended only to the point where defendants were entitled to present, and sentencers were required to consider, information relevant to the sentencing decision. "So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death." *Marsh*,

548 U.S. at 171. Thus, even though the defendant had the burden of producing mitigation evidence, and even though the statute permitted imposition of the death penalty when the aggravating and mitigating circumstances were in equilibrium, the statute was constitutional. Clearly, the United States Supreme Court does not intend to re-write death penalty statutes to substitute its own weighing process for that determined by the state legislature. Based on the rationale of these cases, there is no clearly established federal law that was unreasonably applied by the Mississippi Supreme Court's consideration of this claim on the merits, and Puckett has no habeas claim on this issue.

## IV. CONCLUSION

For all of the foregoing reasons, Petitioner is not entitled to habeas relief. Accordingly,

IT IS, THEREFORE, ORDERED AND ADJUDGED that Larry Matthew Puckett's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 should be and is hereby **DENIED**.

IT IS, FURTHER, ORDERED AND ADJUDGED that this action is hereby **dismissed with prejudice**. A separate final judgment dismissing this action with prejudice shall be entered in accordance with Fed. R. Civ. P. 58.

SO ORDERED AND ADJUDGED , this the 30th day of March, 2009.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE